Randall MORGAN; William K. Chisholm; Ned Swisher; Dianne Elasick; Idaho Conservation League, Inc. and Hagerman Valley Citizens Alert, Inc., Plaintiffs,

v.

Lt. Col. James A. WALTER, United States Army Corps of Engineers; Delmar Vail, United States Bureau of Land Management; Earl M. Hardy; and Box Canyon Trout Co., Inc., Defendants.

Civ. No. 89–1233.

United States District Court, D. Idaho.

Oct. 30, 1989.

Jeffrey C. Fereday, Givens, Pursley, Webb & Huntley, Boise, Idaho, for plaintiffs.

D. Marc Haws, Office of the U.S. Atty., William F. Ringert, Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Chartered, Boise, Idaho, for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DAVID A. EZRA, District Judge.

Plaintiffs' motion for preliminary injunction came on for hearing on September 29, 1989. Jeffrey Fereday, Esq. appeared on behalf of the plaintiffs; Assistant United States Attorney D. Marc Haws appeared on behalf of defendants Lt. Col. James A. Walter, United States Army Corps of Engineers, Delmar Vail, and United States Bureau of Land Management; and William Ringert, Esq. appeared on behalf of defendants Earl M. Hardy and Box Canyon Trout Co., Inc.

The court having reviewed the pleadings, affidavits and exhibits submitted in support of and opposition to the motion, having heard the oral arguments of counsel and the testimony of witnesses, and being fully advised as to the premises herein, grants plaintiffs' motion.

## BACKGROUND

Since 1969, Defendant Earl M. Hardy ("Hardy") has owned approximately 260 acres of land in southern Idaho which includes a large portion of an area commonly known as Box Canyon and a substantial portion of an area commonly known as Blind Canyon. Box Canyon is largely unspoiled and contains many fresh water springs which feed into the 1.5 mile long Box Canyon Creek which empties into the Snake River.

Approximately 41.2 acres within Box Canyon is owned by the United States and is administered by defendant Bureau of Land Management ("BLM"). Due to the admittedly unique natural values of this area, BLM designated its holdings in and around Box Canyon as an Area of Critical Environmental Concern ("ACEC"). This was done as part of the Monument Resource Area Management Plan ("MRAMP") which was completed by BLM in December, 1985.

In order to operate a fish propagation facility on his property near the mouth of Blind Canyon, Hardy proposes to build a diversion facility and a flume on Box Canyon Creek. The dam would divert water to the adjacent Blind Canyon where the hatchery is to be located. The diversion structure is proposed to be built on lands owned by the United States and administered by BLM.

The natural flow of Box Canyon Creek is approximately 720 cubic feet per second ("cfs"). This flow has already been reduced considerably by the Clear Springs facility which is located on the south side of the Snake River opposite Box Canyon. Hardy's project proposes to divert an additional 257 cfs leaving a flow of 75 cfs, or approximately 10% of the creek's natural flow.[1]

Hardy joined in an application for a right of way in 1970. In 1982, after conducting environmental studies, BLM denied Hardy's application but later reinstated the application to allow Hardy to submit additional information and mitigation proposals. In connection with evaluating Hardy's proposed project, BLM began a series of land planning procedures, which resulted in the MRAMP and the ACEC plan.

BLM prepared an Environmental Impact Statement ("EIS") in connection with the MRAMP which covers both Box and Blind Canyons. In November 1986, BLM eventually issued a right of way to Hardy which authorizes the construction, operation, and maintenance of his proposed diversion facility and flume on BLM property.

In connection with its issuance of a right of way, BLM prepared an Environmental Assessment[2] ("EA") which addressed the environmental impacts of the proposed right of way agreement with Hardy on the ACEC. The EA specifically addressed two possible alternatives:[3] (1) denying the right of way proposal ("Alternative One"); and (2) granting the right of way but including specific mitigation measures to accomplish certain levels of environmental protection and/or enhancement to assure the objectives of the ACEC Management Plan are met ("Alternative Two"). The environmental assessment treated Hardy's proposal as an environmentally adverse action and not in conformance with the ACEC Management Plan.

In determining the environmental impact of denying Hardy's right of way proposal under Alternative One, BLM considered the potential consequences of the denial in terms of Hardy's other development alternatives. BLM recognized that should it deny Hardy the right of way on public lands he requested, he had several options including constructing a diversion at the mouth of Box Canyon; developing the upper Box Canyon; diverting water bypassing the existing Clear Springs diversion; or "us[ing] other means to recover investment." BLM EA, p. 3. The BLM environmental assessment separately addressed each of these possible actions which Hardy

---

**1.** By the time the creek reaches the mouth of the Snake River, the streamflow will increase to approximately 162 cfs as a result of other spring contributories.

**2.** The purpose of an environmental assessment is to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 20 C.F.R. § 1508.9(b) (1987).

**3.** BLM actually considered four alternatives; however, two were unacceptable to defendant Hardy and therefore were not considered viable. Hardy rejected Alternative Three which proposed selling his entire interest in Box Canyon to BLM. Hardy also rejected Alternative Four which proposed adoption of Alternative Two with BLM assistance to a privately owned preservation group, in order to accomplish the purchase of Hardy's entire interest in Box Canyon.

might take as a consequence of BLM's outright denial of a right of way.

Giving consideration to the possible consequences inherent in Alternative One, BLM determined in its EIS that Alternative Two, which required several mitigation measures to be taken by Hardy to protect the environment, was preferable to Alternative One and would satisfy the concerns of all relevant agencies.

The right of way agreement as negotiated between BLM and Hardy contained twenty-four stipulations which impose specific restrictions and requirements on Hardy with respect to both building the dam and maintaining the property. BLM determined, in its EA, that an Environmental Impact Statement ("EIS") would not be required since the restrictions and requirements of the right of way agreement adequately addressed the environmental impacts of the project.

In June of 1989, the Army Corps of Engineers ("the Corps") issued a 404 permit[4] to Hardy authorizing construction of the diversion structure and flume. The Corps initially rejected Hardy's application in November 1987 because by-pass flow features and a fish ladder were not included in the proposal. On March 1, 1989, the Corps accepted Hardy's amended application after it was revised to include the by-pass flow and fish ladder.

The Corps relied extensively on the EA prepared by BLM and the mitigation proposal which it contained in reaching its own decision not to prepare an EIS. The Corps' EA which considered four alternatives, determined that the issuance of the 404 permit would not have a significant impact on the quality of the human environment and therefore an EIS was not mandated.

The permit was issued on June 30, 1989 and included terms and conditions designed to protect the environment and to mitigate any adverse effects that the project might have.

Plaintiffs filed their complaint on August 29, 1989 against BLM, the Corps and their officers and agents seeking declaratory judgment and injunctive relief. Plaintiffs amended their complaint to join defendant Hardy shortly thereafter. Plaintiffs include two environmentally concerned citizens groups and individual citizens residing in the Hagerman Valley, an area adjacent to the Box and Blind Canyons. They allege violations of the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), the Federal Land Policy and Management Act ("FLPMA"), and the Administrative Procedure Act ("APA").

Plaintiffs now seek a preliminary injunction to prohibit Hardy from beginning construction on the diversion structure until an EIS has been prepared in compliance with NEPA. Plaintiffs assert that an EIS is required since the Corps and BLM failed to adequately address important issues with respect to the project's impact on candidate species,[5] the aquatic ecosystem, water quality, riparian vegetation and on Blind Canyon. Plaintiffs also argue that the defendants did not consider the cumulative impacts of existing and proposed projects in Box Canyon or the impact of ACEC classification.

On September 29, 1989, a hearing was held on plaintiffs' motion. Plaintiffs presented the testimony of Michelle Stevens, a wetlands expert and former EPA employee who was involved in the assessment of the Hardy project. Ms. Stevens testified in accordance with a memorandum she prepared as an EPA employee which listed several environmental concerns which she recommended be addressed prior to project approval. She testified that in her opinion Hardy's mitigation proposal was inadequate and did not meet EPA's mitigation policy or address the previously stated concerns. She also testified that in her opinion the Corps' EA inadequately considered the direct and cumulative im-

---

**4.** This permit is required by the § 404 of the Clean Water Act for any action which would result in discharge of fill material into the waters of Box Canyon Creek. 33 U.S.C. § 1344(a).

**5.** A "candidate species" is a species which is not listed but is a candidate for listing as a threatened or endangered species by the U.S. Fish and Wildlife Service.

pacts of the Hardy project including the impact on wetlands.

Defendants presented the testimony of Robert Cordell who is the Bennett Hills Resource Area Manager for BLM and the employee responsible for the issuance of the right of way to Hardy. Mr. Cordell testified with respect to the considerations that went into the preparation of the BLM EA and the procedures which were followed.

After testimony and argument were presented at the hearing, defendant Hardy agreed to delay commencing construction of the dam pending the court's decision on plaintiffs' motion. The court took the matter under advisement.

On October 12, 1989, the government defendants filed a motion to hold the court's decision in abeyance for a period of fourteen days in order to allow BLM and the Corps to evaluate the presence of *Lanx* in Box Canyon.[6] The court granted the government's motion on the condition that Hardy not begin construction activities during the additional stay. The court also allowed further briefing on the Lanx issue.

### STANDARD FOR PRELIMINARY INJUNCTION

To obtain a preliminary injunction plaintiffs must show either:

(1) a combination of probable success on the merits and the possibility of irrepara-

ble injury or (2) that serious questions are raised and the balance of hardships tips in its favor.

*U.S. v. Odessa Union Warehouse Co–Op,* 833 F.2d 172, 174 (9th Cir.1987).

### A. *Likelihood of Success on the Merits*

■ Plaintiffs are challenging the decisions of two federal agencies not to prepare EIS's—BLM's failure to prepare an EIS in connection with the Right of Way Agreement and the Corps' failure to prepare an EIS before issuing the 404 permit. Plaintiffs assert that in failing to prepare EIS's, BLM and the Corps have violated NEPA. Plaintiffs also assert violations of the Clean Water Act, the Federal Land Policy and Management Act ("FLPMA") and the Administrative Procedures Act ("APA").

### 1. *Standard of Review*

■ NEPA requires that an environmental impact statement be prepared when substantial questions are raised on whether a project may "significantly impact the human environment." 42 U.S.C. § 4332(2)(C) (1982); *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). The decisions by BLM and the Corps not to prepare EIS's in accordance with NEPA before issuing the right of way and the 404 permit to Hardy will be upheld unless they are unreasonable.[7] *Sierra*

---

**6.** The issue of the Lanx, a freshwater mollusc, arose when the plaintiffs' expert, Dr. Frest, indicated in his affidavit accompanying plaintiffs' motion that he had discovered a Lanx shell in Box Canyon Creek. The government responded to this new information by requesting this court to stay its decision on plaintiffs' motion for preliminary injunction until it could further investigate the existence of Lanx in the creek to determine whether there would be a change in their finding of no significant impact. After a study done by Beak Consultants, Inc. which revealed no Lanx in the creek, the BLM and the Corps concluded that their decisions of no significant impact would remain undisturbed.

**7.** The "reasonableness" standard applied to an agency's decision to not prepare an EIS under NEPA differs from the "arbitrary and capricious" standard which would be applied to the Corps' decision to issue a 404 permit under the Clean Water Act. *Friends of the Earth v. Hintz,*

800 F.2d 822, 830–831 (9th Cir.1986); APA 5 U.S.C. § 706(2).

Although a recent United States Supreme Court case held that the "arbitrary and capricious" standard of review should be applied to an agency's decision whether to prepare a *supplemental* EIS, it did not adequately address the question of what standard should apply to the agency's decision of whether to prepare an EIS in the first instance. *Marsh v. Oregon Natural Resource Council,* —— U.S. ——, 109 S.Ct. 1851, 1859–1860, 104 L.Ed.2d 377 (1989).

There is disagreement among the circuits with respect to the standard for reviewing the initial decision of whether to prepare an EIS. *See River Road Alliance, Inc. v. Corps of Engineers,* dissenting opinion, *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). Some circuits have adopted the "arbitrary and capricious standard." *See e.g. Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980); *River Road Alliance, Inc. v. Corps of Engineers,*

*Club v. U.S. Forest Service*, 843 F.2d 1190, 1192 (9th Cir.1988). The court "should not substitute its judgment for that of an agency if the agency's decision was 'fully informed and well-considered.' " *Friends of Endangered Species, Inc.*, 760 F.2d at 986 quoting *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir.1986). However, an agency's decision not to prepare an EIS is unreasonable under current Ninth Circuit law "[i]f substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment." *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.1988); *Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1178 (9th Cir.1982). An agency's decision not to prepare an EIS may also be unreasonable "if the agency fails to 'supply a convincing statement of reasons why potential effects are insignificant.' " *Save the Yaak Committee*, 840 F.2d at 717, *quoting The Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir.1985).

### 2. *The BLM Environmental Assessment*

Both BLM and the Corps prepared EA's which concluded that there was no significant impact on the environment and therefore an EIS was unnecessary. The court will first consider BLM's EA since the Corps relied extensively on it in preparing its own and in reaching its conclusion with respect to this project.

Plaintiffs raise several issues to demonstrate that BLM's EA is inadequate. They assert, among other things, that BLM's EA inadequately addresses the project's impact on candidate species, its cumulative effects, its impact on wetlands and its impact on the ACEC.

### a. Impact on Candidate Species

NEPA requires an EIS if the action significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.8. In determining if a proposed action "significantly" effects the human environment the CEQ regulations [8] require the agency to consider both "context" and "intensity". 40 C.F.R. § 1508.27. "Context" refers to the effect of an action on society as a whole, the affected region, the affected interests and the locality. *Id.* "Intensity" refers to the severity of the impact.

The specific factors the agency must consider in determining whether the effects of a project are significant include, *inter alia*, "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks" and "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(4), (5) (1987); *See Also Sierra Club*, 843 F.2d at 1193.

Plaintiffs have presented expert testimony, with respect to the Shoshone Sculpin, the Bliss Rapids Snail, the fisherola nuttalli and the Lanx which raise issues of uncertainty and unknown risks. Plaintiffs have also raised issues of controversy [9] through the critical testimony of various wildlife scientists and other experts. *See Foundation for North American Sheep*, 681 F.2d at 1182; *Sierra Club* at 1193, 1194.

---

764 F.2d 445 (7th Cir.1986), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). The Ninth Circuit, nonetheless, continues to adhere to the "reasonableness" standard and this court is compelled to apply that standard here. *Sierra Club*, 843 F.2d at 1192. Were the court to apply the more deferential standard of "arbitrary and capricious" the result might be very different in this case.

8. The Council of Environmental Quality ("CEQ") regulations list several factors the agen-

cy should consider in determining the intensity of impact.

9. "The term 'controversial' refers to 'cases where a substantial dispute exists as to the size, nature or *effect* of the major Federal action rather than to the existence of opposition to a use' " *Foundation for North American Wild Sheep*, 681 F.2d at 1182 (*quoting Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973)); *See also Sierra Club*, 843 F.2d at 1193.

### (1) Shoshone Sculpin [10]

To mitigate impact to the shoshone sculpin, the BLM right of way agreement with Hardy requires artificial pools to be maintained behind the diversion structure in order to offset the loss of sculpin downstream. BLM representative Robert Cordell testified at the hearing that he believed the mitigation requirements of the Hardy proposal would actually enhance the sculpin population in Box Creek.

Cordell's opinion, however, is directly contraverted by the expert testimony of Dr. Griffith, the fisheries biologist who actually prepared a 1981 study of shoshone sculpin which BLM relied upon in preparing their environmental assessment for this project. Dr. Griffith states in his affidavit in support of plaintiffs' motion that he believes the preservation zone and the resulting impoundment of water behind the diversion will not mitigate the significant impact the diversion will have on the shoshone sculpin.

In considering the Hardy proposal, BLM must weigh many competing environmental factors. The court recognizes that the agency has expertise which the court does not in considering a variety of environmental issues. An agency may even choose to disagree with an expert's findings in evaluating a proposed project. The court, however, must insure that the agency has taken a "hard look" at the environmental consequences. *Sierra Club*, 843 F.2d at 1192.

In this instance, BLM makes an assertion which is directly in conflict with the opinion of an expert which it supposedly relied upon. And, while Mr. Cordell of BLM asserted that the mitigation requirements in his opinion are more than adequate to offset impacts, he does not set forth his reasoning or reconcile his determination with the clear expert testimony to the contrary.

The court does not address, nor can it address at this stage in the proceedings, who is correct with respect to the issue of the proposed project's impact on shoshone sculpin. The court merely finds that a "substantial question" has been raised with respect to whether the project may have a significant effect on the environment. The conflicting testimony demonstrates that the possible effects are at best "highly uncertain." 40 C.F.R. § 1508.27(4). In addition, plaintiffs have shown that the project is controversial in that a substantial dispute exists as to its effect. *Foundation for North American Sheep*, 681 F.2d at 1182.

### (2) Fisherola Nuttalli [11]

An issue of uncertainty also arises with respect to the Fisherola Nuttalli candidate species. Mr. Steve Langenstein, the BLM wildlife biologist who contributed to the BLM EA, stated that no known living examples of this species had been found in Box Canyon Creek at the time the EA was prepared, although he suspected that some did exist. Therefore, he was unable to determine whether the mitigation proposal would adequately address any probable harm to the species.

"[A]n agency decision to act now and deal with environmental concerns later ... is plainly inconsistent with the broad mandate of NEPA." *Foundation for North Am. Wild Sheep*, 681 F.2d at 1181. Approval of the Hardy project, without identifying the actual existence of a sensitive species, nor the impact that the diversion might have on them, is inappropriate under the Act. *Id.*

Since the EAs were made, however, a study by Beak Consultants revealed that the species does, in fact, exist in Box Canyon.[12] Both of the agencies considered the

---

**10.** The shoshone sculpin is a small fish which requires cold, clean water and very specific food and cover.

**11.** Also known as the Giant Columbia River limpet, this relatively small mollusc usually occurs in large streams, but suitable habitat also exists in Box Canyon Creek.

**12.** The court does not address the issue of the agencies' duty to supplement their findings of no significant impact. The recent study for potential Lanx was done by the defendants in efforts to comply with their duty to address "significant new information." 40 C.F.R. § 1502.9(c) (1987); *See Marsh v. Oregon Natural Resources Council*, 109 S.Ct. at 1858.

recent discovery of Fisherola Nuttalli in Box Canyon Creek and concluded that the discovery did not change their determinations of no significant impact. Again, however, the agencies failed to specify why the finding is not significant or how the mitigation proposal would adequately address the impacts to this species. *The Steamboaters*, 759 F.2d at 1382, ("The agency must supply a convincing statement of reasons why potential effects are insignificant.")

Mr. William McDonald of the Corps supported his finding stating that "[t]his species was already considered in our original determination as stated in our Department of the Army Permit Evaluation and Decision Document." An examination of the Corps' EA, however, reveals that the Corps only concurred with BLM's findings that the proposed mitigation would "provide adequate populations for future study." As previously discussed, the BLM's findings, although mentioning the Fisherola Nuttalli, did not consider the actual impact of the proposed project on the species since none had been believed to exist in the area of concern. Under these circumstances, Mr. McDonald's statement, without further explanation, does not meet the required standard of reasonableness.

### (3) Bliss Rapids Snail and Lanx

With respect to the Bliss Rapids Snail,[13] the BLM EA concedes that little is known about this species and its streamflow requirements. BLM relied on the MRAMP which encompassed the proposed diversion site and its surrounding area. The EIS prepared in connection with that plan included the Taylor Report which addressed Bliss Rapids Snail and other molluscs.

Plaintiffs' experts assert that there may be no Bliss Rapids Snails in the preservation zone. Plaintiffs' expert also asserts that Bliss Rapids Snails are not found in areas where there is the strongest current, and the reduction of streamflow may extirpate what snails exist in Box Canyon Creek.

Defendants, on the other hand, contend that a 1987 study done by Beak Consultants revealed that Bliss Rapids Snails do, in fact, exist in the preservation zone. While this weighs in favor of the adequacy of the mitigation proposal, the court finds that this study, prepared *after* BLM issued the right of way in 1986, was not considered by the agency in making its finding of no significant impact.

Once again, the issue is one that is "uncertain" and "controversial" and BLM's failure to adequately address this uncertainty and substantiate, in accordance with the relevant statutes, its findings of no significant impact in its EA indicates that there are substantial questions regarding whether the proposed action may have a significant effect upon the human environment. *See Save the Yaak Committee*, 840 F.2d at 717.

With respect to the Lanx, issues have certainly been raised as to the species' existence in Box Canyon Creek. According to the government's recent study, discussed previously, no Lanx were discovered there.[14] Plaintiffs' expert, Dr. Frest,[15] on the other hand, asserts that he has located living examples of this candidate species in Box Canyon Creek in an area not sampled by Beak Consultants. Without determining how these findings should be reconciled, the court finds that there exists some substantial questions as to the existence of this species in the affected area and the possible impacts upon that species.

Accordingly, plaintiffs have raised substantial questions with respect to the impact of the project on the four candidate

---

**13.** This candidate 1 species is a small snail which lives on the underside of instream rocks and may require flowing water to survive.

**14.** As noted earlier, the court does not address the government's duty with respect to new information. Since the government, however, initiated the study, and in part based their decision of no significant impact on it, the court considers that study prepared by Beak Consultants, as well as the research submitted by plaintiffs.

**15.** Dr. Terrence Frest, Ph.D. is an invertebrate paleontologist and freshwater mollusc expert from the University of Washington.

species,[16] and BLM and the Corps have failed to provide "a convincing statement of why the impacts will not be significant." *See Save the Yaak Committee*, 840 F.2d at 717; *The Steamboaters*, 759 F.2d at 1393.

The government defendants argue that they have already considered the impact to these candidate species and have determined that the impact, in light of the mitigation measures, will not be significant. The defendants do not, however, specifically state in their EA's how the mitigation measures will address these adverse impacts. *See LaFlamme v. FERC*, 842 F.2d 1063 (9th Cir.1988), opinion superceded by 852 F.2d 389 (9th Cir.1988). In fact, plaintiffs' experts [17] assert that the mitigation measures will not reduce the impact on the four candidate species and raise substantial questions as to the harm that these species will suffer.

b. Mitigation

At the heart of this dispute is the government agencies' laudable attempt to protect at least a portion of Box Canyon from private development by requiring a preservation zone. The object is to mitigate the effects of the proposed diversion project. The agencies' main argument supporting their determinations of no significant impact rests on defendant Hardy's extensive concessions in allowing restrictions to be placed on his use of the upper third of Box Canyon.

■■ Clearly, mitigation measures may be considered by an agency in determining whether to prepare an EIS. *Friends of Endangered Species*, 760 F.2d at 987; 40 C.F.R. § 1508.20(e). An EIS must be pre-pared, however, where substantial questions are raised as to whether these mitigation efforts are adequate. *Foundation for North Am. Wild Sheep*, 681 F.2d at 1181; *LaFlemme v. FERC*, 852 F.2d 389, 399 (9th Cir.1988).

Although the Ninth Circuit has held off-site mitigation to be acceptable under appropriate circumstances, it has not addressed the issue where there has been a specific challenge to the adequacy of the off-site mitigation area. *Friends of the Earth*, 800 F.2d 822, 838, f.n. 17. (A substitute wetlands site was sufficient to mitigate impact of landfill and justified the Corps' decision not to prepare an EIS where plaintiffs did not specifically attack the adequacy of the substitute mitigation site.)

In this case, Hardy's most significant mitigation measure is his designation of the upper third of Box Canyon as a preservation zone. Plaintiffs challenge the adequacy of this proposal by alleging that the candidate species in question are not known to exist in this portion of the canyon.[18] Without determining the validity of their argument at this time, the court finds that substantial questions have been raised with respect to the adequacy of the agreed upon preservation zone to mitigate the the adverse environmental impacts of the proposed project.

The test the court must apply is whether "the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor." *Columbia Basin Protection Ass'n v. Schlesinger*, 643 F.2d 585, 597 (1981); *The Steamboaters*, 759 F.2d at

**16.** The BLM environmental assessment identified four candidate species existing in the Box Canyon Region: the Shoshone Sculpin; the Bliss Rapids Snail; the Fisherola Nuttalli (a.k.a. Giant Columbia River Limpet) and the Utah Volvata Snail.

**17.** Plaintiffs' experts include:
(1) Dr. Terrence Frest, an invertebrate paleontologist and expert on freshwater molluscs;
(2) Tim Cochnauer, a fisheries biologist who works for the Idaho Fish and Game Department; and

(3) Dr. Griffith, a fisheries biologist who prepared a report on shoshone sculpin for BLM in 1981.

**18.** Defendants' recent study of Lanx revealed that fisherolla nuttalli did exist in the preservation area. Although this discovery helps to substantiate the government's position with respect to Hardy's mitigation proposal, it does not remedy their failure at the EA stage to reasonably determine whether substantial questions were raised with respect to the significance of the proposed project's environmental impact.

1392. If plaintiffs' experts are correct,[19] which the court does not determine at this time, with respect to the lack of population of candidate species in the preservation zone, the project may significantly reduce or threaten these species' existence.

Defendants additionally assert that the minimum streamflow requirement of 75 cfs will mitigate the environmental impacts of the Hardy proposal. Three of plaintiffs' experts, however, argue that this reduction in streamflow will likely result in extreme reduction or extirpation of the candidate species in question. The court cannot at this stage determine who is correct, nor does it mandate a methodology or rule to apply to determine an acceptable level of streamflow;[20] however, the court finds that the plaintiffs have raised sufficient questions with respect to the adequacy of the minimum streamflow to mitigate the significant impact the proposed project may have on candidate species.

Despite the mitigation agreement between Hardy and the government, the court finds on the record before it that it is likely that the building of the diversion structure on BLM lands within an Area of Critical Concern is a major federal action which "may significantly degrade some human environmental factor." *Columbia Basin Protection Ass'n v. Schlesinger*, 643 F.2d 585, 597 (1981).

3. *The Corps' Environmental Assessment*

Plaintiffs also assert that the Corps violated NEPA by failing to prepare an EIS in connection with the issuance of the 404 permit. Again, as discussed previously, the court will only reverse the Corps' determination not to prepare an EIS if it finds it to be unreasonable. *Sierra Club* at 1192.

■ Plaintiffs criticize the Corps' EA for relying too heavily on BLM's EA rather than doing its own independant evaluation. The court cannot fault the Corps' EA on this ground alone, however, since the Corps asserts that it independantly verified the information. *Friends of the Earth, Inc.*, 800 F.2d at 834–35.

In March 1987, the Environmental Protection Agency ("EPA") indicated concerns to the Corps with regard to impacts of the project on candidate species, the aquatic ecosystem, stream flow integrity, and water quality. The EPA also expressed concern about the cumulative impacts of existing and proposed projects.

The Corps EA addressed these concerns almost entirely by relying on the BLM EA. Although their reliance on BLM's EA was not in itself improper, as the court previously discussed, substantial questions have been raised with respect to the significant environmental impacts of the Hardy proposal which BLM's EA did not address.

In particular, by relying on BLM's EA which was prepared over two years before, the Corps failed to adequately explain how the proposed measures would mitigate the impacts on candidate species.

There is no dispute that the EPA ultimately approved of the Corps' issuance of

---

**19.** Defendants present evidence showing that the Bliss Rapids snail is known to exist in the upper canyon region. This finding was made by Beak Consultants in a 1987 study done for the City of Tacoma, Washington. The study, however, was done subsequent to BLM's EA and accompanying mitigation proposal. BLM had not investigated the existence of candidate species in the upper canyon.

**20.** Plaintiffs argue that the environmental assessments are inadequate because the methodology used by BLM to determine a minimum stream flow was both out-dated and improperly applied. NEPA, however, does not require that the court resolve disagreements between scientific methodologies. *Friends of Endangered Species* 760 F.2d at 986. Nor does NEPA require an environmental assessment to be based on the best scientific methodology available. *Id.*

BLM presents documentation which outlines the lengthy process which it went through to reach a 75 cfs minimum acceptable bypass flow. To determine this figure a combination of methods was used—the Wetted Perimeter Technique and the Tenant Method. The Idaho Fish and Game Department ("Idaho Fish and Game") and U.S. Fish and Wildlife Service responded to the various Hardy proposals, and ultimately supported the 75 cfs determination; however, Mr. Jerry Conley of Idaho Fish and Game has since clarified his position with respect to the minimum streamflow level and claims that Idaho Fish and Game does *not* endorse Hardy's project.

the 404 permit. A letter from EPA officials to the Corps on June 13, 1989 stated that the Corps draft decision "satisfactorily addresses the concerns raised in our previous comment letter and in discussions with you and your staff."

The standard the court must apply to the Corps decision, however, is not whether the EPA was satisfied,[21] but rather, whether the Corps "stated convincing reasons" for their determination of no significant impact. *Save the Yaak Committee* 840 F.2d at 717. The Corps' reasons for determining that an EIS was not necessary, with respect to candidate species, cumulative impacts, and water quality are based on BLM's EA which, as discussed above, probably is inadequate.

### 4. Connected Actions

CEQ regulations require that "connected actions" be considered together in a single EIS. 40 C.F.R. § 1508.25(a)(1); *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.1985). "Connected actions" are defined as actions that:

(i) automatically trigger other actions which may require environmental impact statements.

(ii) cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) are interdependent parts of a larger action and depend on the larger action for their justification. *Id.*

Plaintiffs assert that Hardy's proposed fish propogation facility in Blind Canyon is a "connected action" and defendants have violated NEPA by failing to consider it in their EAs.

Defendants argue that the Blind Canyon facility does not need to be considered in conjunction with the proposed diversion since no discharge will be made, it is not currently impacting wetlands, and if it does, such discharge will be covered by a nationwide permit. The Corps basically asserts that it has no obligation to consider Hardy's purely private project in connection with issuing the 404 permit.

Recently, in *Sylvester v. U.S. Army Corps of Engineers*, the Ninth Circuit Court of Appeals held that the Corps was not required by NEPA to consider the impact of an entire resort when issuing a 404 permit for a golf course which would be built on wetlands within the resort. 884 F.2d 394 (9th Cir.1989). The court distinguished the case from previous holdings which required the consideration of connected actions. The court described the actions in *Sylvester*, as "a separate segment of chain" as opposed to previous cases which dealt with "links in the same bit of chain." *Id.* The court stated "[w]e do not understand how [defendant's] desire to place the course in a meadow that contains wetlands can federalize the entire resort complex."

The inquiry here, then, is whether the proposed diversion and the Blind Canyon Creek propagation facility are "links in the same bit of chain." The Ninth Circuit decision indicates that the court should be more deferential to the Corps' determination with respect to what actions should be considered in issuing a 404 permit. In applying the enunciated standard, however, for purposes of this motion for preliminary injunction, the court finds that the fish propogation facility is probably more "like a link in the same bit of chain." Unlike the golf course and resort in *Sylvester, Id.*, the fish propogation facility could not exist absent a diversion. Therefore, the propagation facility should probably have been considered by the Corps in preparing its EA.

Having so found, the court, however, does not decide whether the agencies were required to also consider the potential hydroelectric plant which plaintiffs assert Hardy *might* construct in the area at some future point. The court defers to the agencies' finding that the hydroelectric project was not "reasonably foreseeable." 40 C.F.R. § 1508.

**21.** This is not to say that the EPA's input is not important. *See Friends of Endangered Species*, 760 F.2d at 986. The fact that the EPA did finally approve of the project does have some weight; however, the record fails to indicate at this point what factors the EPA considered.

### B.  *Irreparable Injury*

Having determined that the plaintiffs have a strong probability of showing that, under the Ninth Circuit's "reasonableness test," substantial questions are raised regarding whether the proposed project may have a significant effect on the environment, the court next determines whether the plaintiffs have shown the possibility of irreparable injury.  *Odessa Union Warehouse Co–Op*, 833 F.2d at 174.

Although irreparable damage may not be presumed in environmental cases, "Environmental injury, by its nature, can seldom be adequately remedied by money damages...."  *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).  "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Id.*

Three different experts have asserted that the proposed diversion structure is likely to impose irreparable harm to the environment, in particular to the candidate species in question.  BLM, in its resort to the mitigation proposal, has conceded that there will be a significant impact in lower Box Canyon if this project goes forward. This court has no basis to determine otherwise.

Although the court must issue the preliminary injunction pursuant to the standards which the law imposes, it does so with great reservation in this case.  While plaintiffs have successfully raised questions as to the environmental impacts of Hardy's proposed project and the irreparable harm which might ensue, they may not have considered, as the government claims to have done, the impacts to Upper Box Canyon of not allowing Hardy to begin construction of the dam.

Nevertheless, the court finds plaintiffs have shown that Hardy's proposed project probably will result in irreparable harm to some elements of the environment and, under the standards set forth by the Ninth Circuit, this court must issue a preliminary injunction until a further and more detailed examination of the merits of this case may ensue.

### C.  *Bond*

■  Fed.R.Civ.P. 65(c) provides for the imposition of a bond upon the applicant for preliminary injunction "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  The court, however, may dispense with the requirement of a bond "where requiring a security would effectively deny access to judicial review."  *California v. Tahoe Regional Planning Agency*, 766 F.2d 1316, 1325 (1985).

Plaintiffs request that the court not impose a bond pursuant to Fed.R.Civ.P. 65(c). Plaintiffs have submitted an affidavit indicating that they are private citizens and citizens groups with very limited financial resources and no financial interest in the outcome of this lawsuit.  Defendants have not submitted evidence to the contrary.

The court finds that although the economic hardship to defendant Hardy may be significant, imposition of a bond upon plaintiffs would be unreasonable and tantamount to denying them access to judicial review in this matter.  Therefore, no bond will be imposed at this time.

### CONCLUSION

The court is not unmindful of the many steps that defendant Hardy and the government defendants have taken over the past several years to strike a balance between Hardy's interest in productive use of his property and the public and environmental interests in preserving this unique and pristine natural area.

The proposed mitigation proposal, wherein Hardy designates a significant portion of his land as a preservation zone, is to be commended and demonstrates the sincere efforts which he has made toward reaching a sensible solution to the competing interests involved in this matter.  Nevertheless, the law requires certain steps to be taken to ensure that agencies carefully consider the specific impacts that a major federal action will have on the environment.  One

of these steps is the preparation of an environmental impact statement when the project may significantly effect the environment.

Despite the efforts of the government to comply with the requirements of NEPA, the court is compelled, through the application of the "reasonableness" standard, to find that the plaintiffs probably have raised substantial questions as to the significance the Hardy proposal, even with the proposed mitigation measures, may have on the human environment.

The court's decision is limited to finding that substantial questions have been raised which have not adequately been addressed by the government in preparation of its environmental assessments and therefore, in light of the possibility of irreparable harm to the environment, a preliminary injunction is warranted.

Therefore, for all the reasons stated above, the court GRANTS plaintiffs' motion for preliminary injunction.

IT IS SO ORDERED.