**CITIZENS ALLIANCE TO PROTECT OUR WETLANDS, Plaintiff,**

v.

**Colonel Donald T. WYNN, et al., Defendants.**

No. C95–591Z.

United States District Court, W.D. Washington, Northern Division.

May 11, 1995.

Jeffrey M. Eustis, Seattle, WA, for Plaintiff.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, for Donald T. Winn, Colonel, District Engineer for the Seattle District of the United States Army Corps of Engineers, Togo D. West, Jr., Secretary of the Army Department of the Army, U.S. Army Corps of Engineers.

Peter L. Buck, Buck & Gordon, Seattle, WA, and Rodney L. Brown, Jr., Morrison & Foerster, Seattle, WA, for Northwest Racing Associates Limited Partnership dba Auburn Racing, Racing, Inc.

Robert G. Nylander, Jr., Cutler & Nylander, P.S., Seattle, WA, for Metro Sand & Gravel, Inc., La Terra Limited Partnership.

## ORDER

ZILLY, District Judge.

THIS MATTER comes before the Court on separate motions for a temporary restraining order, docket no. 2, and a preliminary injunction, docket no. 14, brought by Plaintiff Citizens Alliance to Protect Our Wetlands (CAPOW). CAPOW is a non-profit corporation representing property owners and residents within the Auburn area of King

County. CAPOW alleges that the Federal Defendants,[1] in issuing a permit to Defendant Northwest Racing Associates (NRA) to fill 17.4 acres of wetlands in Auburn, violated both the Clean Water Act (CWA), 33 U.S.C. § 1344, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332.

CAPOW filed its motion for a temporary restraining order (TRO) to halt the filling of the wetlands at issue on April 18, 1995. The parties agreed to postpone the Court's consideration of the motion for a TRO until May 8, 1995, at which time the Court would hear oral argument on CAPOW's motions for a TRO and a preliminary injunction. The parties submitted a stipulation, and the Court signed the proposed order, allowing NRA to fill up to 2.5 additional acres of wetlands on or before May 8, 1995; prior to the stipulation, NRA had already filled 2.8 of the 17.4 acres permitted.

On May 8, 1995, the Court heard oral argument from the parties on the motions for a TRO and a preliminary injunction.[2] Having considered the oral arguments of the parties, and having reviewed all papers filed in support of, and in opposition to, the motions for a TRO and a preliminary injunction, the Court hereby DENIES both motions.

### Background

In December 1992, NRA applied to the Corps for a permit under § 404 of the Clean Water Act to fill 53 acres of wetlands to construct a thoroughbred horse racing facility on a 196–acre site in Auburn. In August 1993, NRA submitted a revised permit application seeking to fill 17.1 acres of "palustrine emergent wetlands" and 0.3 acres of "scrub-shrub wetlands" for a scaled-down 165–acre project. AR 2423, 2500.

In December 1993, the Corps determined that an Environmental Impact Statement (EIS) would be required. The Corps then proceeded to perform a "practicable alternatives" analysis, examining 16 possible sites, including Auburn and Lacey. NRA had originally stated as the project purpose: "to construct and operate a thoroughbred horse racing track in Auburn, Washington, to replace the former Longacres Park in Renton, Washington." AR 2504. The Corps redefined the project purpose more broadly as follows:

> To develop and operate an economically viable thoroughbred horse racing facility in western Washington to meet the long-term needs of Washington's thoroughbred horse racing industry.

*Id.* In evaluating the alternatives, the Corps used seven criteria, one of which was whether

> [t]he project can generate adequate handle to support the industry. This would require a mutuel handle of approximately $153 million per year or a $10 million purse.

AR 2505. The Corps calculated "mutuel handle" as including the amount wagered on-site at the proposed racetrack facility and the amount wagered at "satellite" facilities on races held at the proposed live racetrack. Final EIS (January 1995), Appendix B5 (Technical Evaluation of Alternative Sites) at 7 (docket no. 28). The potential "handle" is one indicator of whether the racing facility is economically viable. By tentative agreement of the Horseman's Benevolent Protection Association, the "purse" (or the amount of money awarded to owners of winning horses) represents 6.5% of the mutuel handle. Final EIS, Appendix B5 at 7 (docket no. 28).

The Corps determined that none of the sites except the proposed Auburn site satisfied all seven criteria. In this suit, CAPOW

---

1. The following defendants are referred to collectively as either "Federal Defendants" or "Corps": Donald Wynn, District Engineer for the Seattle District of the United States Department of the Army Corps of Engineers; Togo D. West, Jr., Secretary of the Army; and the United States Department of the Army Corps of Engineers.

2. The Court also heard oral argument on the Corps' motions to strike certain non-record materials submitted by CAPOW, docket nos. 39 & 81, and on the Corps' motion to supplement the administrative record, docket no. 58. After hearing the oral arguments of the parties, the Court issued an oral ruling permitting the Corps to supplement the record with the Declaration of Patricia Cardinal, docket no. 41, and allowing the Reply Declaration of Malcolm Gable, docket no. 68. The Court granted the motions to strike as to the remaining declarations at issue.

claims that the Lacey site constituted a "practicable alternative" having a "less adverse impact on the aquatic ecosystem" than the Auburn site. *See* 40 C.F.R. § 230.10(a). CAPOW charges the Corps with violating the Clean Water Act by issuing a permit to fill the wetlands at issue when a practicable alternative existed. The Corps concluded, however, using four different scenarios, that the Lacey site could not generate adequate handle.[3] Thus, the Corps determined that Lacey was not a practicable alternative. In January 1995, the Corps published the Final EIS. NRA received a § 404 permit for the Auburn site on April 7, 1995. CAPOW filed this action on April 18, 1995.

### Analysis

#### A. Standard for Preliminary Injunction

█ To obtain a preliminary injunction, the moving party must show either "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Big Country Foods, Inc. v. Board of Education,* 868 F.2d 1085, 1088 (9th Cir. 1989). Under this formula, the degree of irreparable injury required increases as the probability of success on the merits decreases. *Id.* The same standard applies to the issuance of a temporary restraining order. *See Graham v. Teledyne–Continental Motors, Div. of Teledyne Indus., Inc.,* 805 F.2d 1386, 1388 (9th Cir.1986), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987).

#### B. Success on the Merits/Serious Questions

##### 1. The Clean Water Act[4]

The regulation at issue, 40 C.F.R. § 230.10, provides in part:

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

· · · · ·

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

· · · · ·

(3) Where the activity associated with a discharge which is proposed for a special aquatic site ... is not "water dependent"[ ], practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.

· · · · ·

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

Here, the project purposes are not water dependent, and thus, the Corps' regulations presume that practicable alternatives exist unless "clearly demonstrated otherwise." *See Sylvester v. United States Army Corps of Engineers,* 882 F.2d 407, 409 (9th Cir.1989) ("[C]lassification of an activity as 'non-water dependent' does not serve as an automatic bar to issuance of a permit ... [; it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives.") (citing *Louisiana Wildlife Fed'n, Inc. v. York,* 603 F.Supp. 518, 527 (W.D.La. 1984), *aff'd in part and vacated in part,* 761 F.2d 1044 (5th Cir.1985)).

---

**3.** Projected handles for Lacey were: $127.0, $128.8, $101.8, and $140.8 million per year. AR 2517 (Appendix I to Record of Decision).

**4.** Although Plaintiff has also alleged in its complaint a violation of NEPA, Plaintiff has not presented its theories on this issue in its motions papers. The Corps' NEPA Guidelines provide that "where the district engineer determines that there are unresolved conflicts concerning alternative uses of available resources, the EA [Environmental Assessment] shall include a discussion of the reasonable alternatives which are to be considered by the ultimate decision-maker." 33 C.F.R. Part 325, Appendix B § 7(a). Plaintiff has not explained how it believes the Corps violated this regulation or any other requirement under NEPA.

### 2. Standard of Review of Agency Decision

■ The Administrative Procedures Act, 5 U.S.C. § 706(2), provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This standard applies to agency determinations to issue a permit under § 404 of the Clean Water Act. *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir.1986). This standard is "highly deferential." *Id.* at 831. The Court may not set aside agency action as arbitrary or capricious "unless there is no rational basis for the action." *Id.*

### 3. The Lacey Alternative

Plaintiff's arguments boil down to one proposition: that the Corp arbitrarily or capriciously concluded that Lacey was not a practicable alternative because it could not generate adequate handle. Plaintiff does not contest the amount of the threshold handle ($153.8 million per year) used by the Corps to assess the economic viability of the alternative sites. Rather, Plaintiff contends that the Corps incorrectly calculated Lacey's potential handle for one of three alternative reasons: (1) exclusion of intrastate intertrack-in revenues; (2) assignment of a constant value ($32.5 million) to the revenue generated by wagering at satellite facilities; and (3) use of inaccurate population and income data. The Court concludes that Plaintiff shows little to no probability of success on the merits and also fails to raise probability of success on the merits and also fails to raise serious questions as to whether the Corps acted arbitrarily or capriciously in concluding that Lacey could not generate adequate handle.

#### a. Simulcast of Races at Other Washington Tracks

■ Plaintiff argues that the Corps inappropriately excluded from its calculation of Lacey's potential handle the income generated from on-site wagering on races run at other tracks within the state. Plaintiff labels this revenue "intrastate simulcast-in" or "intrastate intertrack-in." Plaintiff alleges that, by excluding intrastate intertrack-in, the Corps reduced Lacey's potential handle by $18.6 million per year.

In response, the Corps explains that intrastate intertrack-in generates additional revenue and therefore contributes to the bottom line, but does not generate additional handle for western Washington because the purse goes to horse owners and breeders in eastern Washington. The Corps analogized intrastate intertrack-in revenues to income from parking and track concessions. Hence, the Corps included intertrack-in revenue in determining maximum project costs, but excluded it from the calculation of handle. AR 2571. The Corps also offers other reasons to support its decision, such as the lack of control a western Washington track would have over eastern Washington tracks and a required increase in the threshold mutuel handle if intertrack-in revenues were included. The Court concludes that the various reasons stated by the Corps constitute a rational basis for excluding intertrack-in revenue from the calculation of handle.

#### b. King County Satellite Handle

■ The Corps assigned a constant value of $32.5 million per year to handle generated by satellite (off-track) wagering on races run at the proposed racetrack. Plaintiff argues that the Corps failed to account for an increase in satellite wagering if the track were located outside King County. According to Plaintiff, a separate satellite facility would be permitted inside King County only if the track were located outside King County.[5] Plaintiff theorizes that the Lacey site would generate an additional $12.7 to $23.2 million as a result of wagering at a King County satellite facility.

---

5. Plaintiff does not provide any citations for its statement of the law, which may not be accurate. *See* RCW 67.16.200(1)(a) ("The commission may approve only one satellite location in each county in the state ..."); RCW 67.16.200(1)(b) ("The commission shall not allow a licensee to conduct satellite wagering at a satellite location within twenty ground miles of the licensee's racing facility."). For purposes of this Order, however, the Court accepts Plaintiff's view of the law.

In response, the Corps offers several reasons supporting its decision to assign a constant $32.5 million to satellite handle, including *inter alia:* (1) since the introduction of satellite wagering in 1988, the total handle has remained at its historic levels; (2) between 1990 and 1994, average handle levels at satellite facilities actually declined; and (3) the continuing viability of the industry depends on the creation of new fans and satellite wagering creates few if any additional fans. *Compare* AR 2584–85. The Corps acknowledged the additional income a King County satellite might generate, but weighed the additional revenue against the uncertainties in the satellite market and concluded that a constant figure for satellite handle was more appropriate. AR 2584.

Plaintiff replies that the Corps' discounting of satellite handle for the Lacey site on the basis of uncertainty regarding the market is arbitrary. Plaintiff argues that, by discounting satellite handle for non-King County alternatives, the Corps has covertly added a criterion that the racetrack be located near the old Longacres site to take advantage of the mature fan base and infrastructure. The Court, however, finds the Corps' decision to use a fixed amount for satellite handle well supported by the historical data regarding satellite wagering and its inability to increase the overall mutuel handle.[6] Thus, Plaintiff fails to show any probability of success on the merits with regard to incremental increases in satellite wagering.

### c. *Population and Income Data for Lacey Site*

Plaintiff alleges that the Corps made several errors in calculating the potential handle for the Lacey site, as follows: (1) using an incorrect site location; (2) using 1993 instead of 1994 or 1995 population data; (3) deflating the per capita income data; (4) using Dupont site data instead of Lacey site data; and (5) reducing the total market population by 250,000 people. The Court addresses each argument seriatim.

### i. *Site Location*

■ Plaintiff alleges that the Corps used an incorrect location for the Lacey site and thus incorporated erroneous population data into its calculations. At oral argument, the Corps accepted Plaintiff's representation that the Corps based its calculations on a freeway exit ramp 3.46 miles south of the ramp closest to the proposed Lacey site. The Properties Four Group, which apparently owns the Lacey site, previously raised this issue with the Corps. In a Memorandum for the Record, the Corps addressed the complaint that it had underestimated the population for the Lacey site, and concluded that no significant change in handle resulted from using the location specified by the Properties Four Group and its consultants, Coopers & Lybrand (C & L). AR 2592.

In performing its recalculations, the Corps assumed that the specific track location defined by C & L was more appropriate than the location further south previously used in evaluating the Lacey site. AR 2591. The Corps decided to use 1993 population data instead of C & L's 1994 data to maintain consistency with the analyses performed for the other alternatives. AR 2591. In addition, the Corps rejected C & L's per capita income (PCI) data in favor of the data previously used by the Corps, finding that C & L's data showed excessively high PCIs. AR 2592. Using the new site location, and the adjusted population and PCI data, the Corps recalculated the potential live handle for Lacey under the four scenarios and found a maximum increase over the previous numbers of $5.7 million per year. *Id.*

---

**6.** The Court notes the explanation provided in the administrative record by NRA:

The reality is that this is a zero sum game because there is a finite population of thoroughbred wagering patrons in western Washington. The finite population of the King County population who are persons who are going to participate in parimutuel wagering

... are either going to participate at a live track or at an off track facility—*you can't count them twice.*

AR 2308–09 (letter to Corps from Ron Crockett, NRA). The Court makes no findings as to whether parimutuel wagering is a "zero sum game," but does conclude that the Corps made rational

| Previous [7] | New | Difference |
|---|---|---|
| $127.0 MM | $128.7 MM | $1.7 MM |
| $128.8 MM | $129.6 MM | $0.8 MM |
| $101.8 MM | $107.5 MM | $5.7 MM |
| $140.8 MM | $145.4 MM | $4.6 MM |

*Compare* Final EIS, Appendix B5, Table 4 (Lacey) (docket no. 28) *with* AR 2592 (and adding satellite handle of $32.5 million).

C & L had calculated an increase of $19 million per year (and Plaintiff here uses that same estimate). The Corps concluded that C & L arrived at the $19 million figure by using unreasonably high PCI estimates and incorrect population numbers. AR 2592. The Court finds that the Corps adequately considered the impact of the difference in site locations, which was minimal, and did not act arbitrarily or capriciously in continuing to refer to its original numbers.

### ii. *1993 Data*

■ With regard to the Corps' decision to deflate the population numbers to 1993 levels, Plaintiff argues that the Corps should have instead updated the numbers for all the other alternatives. Although the use of more current data might be desirable, the Corps had a rational basis for deciding to use 1993 population data for the sake of consistency in re-evaluating the Lacey site as opposed to reanalyzing all 16 sites using 1994 or 1995 data.

### iii. *Per Capita Income*

■ As to the PCI estimates, the administrative record does not adequately reflect why the Corps chose to ignore C & L's offered data in favor of the previously used PCI figures. Thus, the Court turns to the Declaration of Patricia Cardinal, docket no. 41, for an explanation. *See Friends of the Earth*, 800 F.2d at 829 ("A court may consider evidence outside the administrative record as necessary to explain agency action."). Ms. Cardinal explains that C & L, on behalf of Properties Four, Inc., provided inconsistent PCI data. In Attachment 3 to a letter for-

warded to the Corps, C & L stated a 1994 PCI of $14,909 within a 25–mile radius of Lacey, or the primary market. AR 2291. In another attachment to the same letter, C & L showed a 1994 PCI of $16,977 for the same area. AR 2293. C & L evidently used the higher number to calculate the potential handle for the Lacey site. Instead of using C & L's numbers, Ms. Cardinal adopted the figure provided by Urban Decision Systems, Inc. for 1993: $14,951. Urban Decision Systems showed a decline in PCI for 1994 to $14,909, which is the same number provided by C & L in Attachment 3 (AR 2291). In adopting the 1993 estimate, Ms. Cardinal remained consistent with the analyses performed for the other sites. The Court does not find Ms. Cardinal's reasoning either arbitrary or capricious.

### iv. *Dupont Site Data*

■ As to the secondary (25–50 mile radius) market, Ms. Cardinal adopted the PCI figures for the Dupont alternative, which is geographically close to the Lacey site. Declaration of Patricia Cardinal ¶ 18 (docket no. 41). In doing so, Ms. Cardinal used "more than generous" PCI estimates for Lacey because the secondary market around Dupont encompasses more of the higher income areas of metropolitan Seattle than the secondary market around Lacey, which is approximately 10 miles southwest of Dupont. *Id.* Again, the Court does not find Ms. Cardinal's analysis arbitrary or capricious.

### v. *Total Market Population*

■ Plaintiff argues that the Corps inappropriately eliminated 250,000 potential patrons from the total (primary, secondary, and tertiary) market for Lacey. The Corps does not provide in the administrative record an explanation for why it decreased the total market population. *See* AR 2591. Thus, the Court turns again to Ms. Cardinal's declaration. Ms. Cardinal explains that the Lacey

---

determinations based on the totality of the evidence presented to it.

7. In recalculating the live handle, the Corps discovered that it had previously used the PCI data for North Bend rather than Lacey. AR 2592; Declaration of Patricia Cardinal at ¶ 11 (docket

no. 41). Therefore, the numbers in the Final EIS are incorrect. The error, however, operated in favor of the Lacey site, as indicated by the Corps' recalculated live handle using the correct PCI data. *See* AR 2592 (table, middle column).

proponents provided a total market population estimate that was 250,000 higher than the total market figures for the other alternatives. Declaration of Patricia Cardinal ¶ 14 (docket no. 41). According to Ms. Cardinal, the total market population should remain relatively constant from site to site. *Id.* Thus, Ms. Cardinal reduced the Lacey proponents' projections by 250,000 to bring Lacey in line with the other sites.

To explain the 250,000-person disparity, Plaintiff asserts that the Corps inappropriately used tertiary data for a 50-to-75 mile radius, rather than a 50-to-100 mile radius. As support, Plaintiff cites the extra-record Reply Declaration of Malcolm Gable, docket no. 68. In his declaration, Mr. Gable points to a chart, on which the Corps evidently relied (*see* Declaration of Patricia Cardinal ¶ 9), providing 1993 population estimates for the "50–75 mile radius" surrounding the various sites. *See* AR 2942. Plaintiff asserts that the Corps inappropriately excluded from its calculations the market for the 75-to-100 mile radius and artificially deflated the total handle each of the 16 sites could produce.

At oral argument, the Corps offered two responses: first, the tertiary market includes all of western Washington except the primary and secondary market, not just the 50-to-100 mile radius around the site; and second, the column on the chart at AR 2942 is mislabeled and reflects the populations for the tertiary market as defined in the Final EIS, not just the 50-to-75 mile radius. The Court finds both of the Corps' responses supported by the administrative record. The Technical Evaluation of Alternative Sites, Appendix B5 to the Final EIS, defined the tertiary market as the remainder of western Washington. Final EIS, Appendix B5 at 12 (docket no. 28). In an unsigned memorandum, which the Corps represents was submitted by NRA, the tertiary market is defined as "the rest of Western Washington outside the primary and secondary areas." AR 1253. Attached to that memorandum is a chart providing the tertiary market populations for five of the 16 sites. AR 1256. These same numbers are reflected in the chart at AR 2942 under the column incorrectly labeled "50–75 mile radius."

In rebuttal, Plaintiff's counsel asked, if the tertiary market consists of the remainder of western Washington as the Corps contends, why do the total market populations vary from site to site. In her declaration, Ms. Cardinal explained that the small variations in the total population from site to site could be attributed to "slight imprecisions in the data-gathering methodology used by the demographers." Declaration of Patricia Cardinal ¶ 14 (docket no. 41). The Court finds this explanation reasonable and also notes that the total market populations for all sites fall within the range of 3.71 to 3.81 million people.[8] Thus, the Court concludes that the Corps had a rational basis for determining that the total market population should remain relatively constant from site to site and deciding to reduce the Lacey proponents' population projections by 250,000 people.

The Court finds that Plaintiff has failed to establish either the probability of success on the merits or the serious questions sufficient to warrant the award of either a temporary restraining order or a preliminary injunction. Although this determination alone supports the Court's denial of Plaintiff's motions, the Court nevertheless addresses the remaining issues of irreparable injury and balance of hardships.

C. *Irreparable Injury/Balance of Hardships*

The Corps and NRA argue that the environment will not suffer irreparable injury as a result of the project at issue because the mitigation plan requires NRA to enhance, restore, and create 56.5 acres of high quality wetlands on Mill Creek at an estimated cost of $4.3 million. Plaintiff replies that the CWA requires mitigation whenever a § 404 permit to fill wetlands is issued, and therefore, irreparable harm to some portion of the

8. Table 4 in Appendix B5 to the Final EIS shows the total market populations for 8 of the 16 sites, including Auburn and Lacey. The highest total market population is 3.81 million for the Arlington/Marysville site. The lowest number is 3.71 million for the Auburn site. The average total market population for the 8 sites is 3.75 million, and 4 of the 8 sites have total market populations within 0.01 million (10,000) of the average.

environment, irrespective of the mitigation plan, satisfies the second prong of the preliminary injunction standard. Plaintiff relies on *Morgan v. Walter,* 728 F.Supp. 1483 (D.Idaho 1989), for support. Plaintiff's reliance is misplaced.

*Morgan* concerned an agency's decision not to prepare an EIS. An EIS is required if the proposed action significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C). An agency's decision not to prepare an EIS is reviewed under the less deferential "reasonableness" standard. *Morgan,* 728 F.Supp. at 1487 n. 7. In determining whether to prepare an EIS, an agency may consider the planned mitigation measures. *Id.* at 1491. The agency, however, must prepare an EIS when substantial questions exist as to whether the mitigation efforts will be adequate. *Id.* In another case, in which the plaintiffs made no attack on the adequacy of the mitigation efforts, the Ninth Circuit held that the Corps was entitled to consider the impact of the mitigation plan in deciding not to prepare an EIS. *Friends of the Earth,* 800 F.2d at 838. Plaintiff fails to explain why the Court cannot likewise consider the effect of the mitigation plan, the adequacy of which Plaintiff does not challenge,[9] in assessing whether irreparable injury will occur.

Appendix B3 of the Final EIS contains the Final Wetland Mitigation Plan for the Auburn Thoroughbred Racetrack Project. The Implementation Addendum to the Final Wetland Mitigation Plan, AR 2610–55, contains revisions made pursuant to comments from the Corps and other agencies. The Mitigation Plan includes:

1. Removal of all cattle from the mitigation site to improve water quality;

2. Removal of fill from approximately 4 acres to re-establish wetlands;

3. Excavation of approximately 5 acres to create open water ponds for waterfowl habitat;

4. Addition of habitat features for fish in a new meander in Mill Creek;

5. Creation of backwater channels and a new meander in Mill Creek to enhance fish habitat;

6. Removal of Reed Canary Grass and reestablishment of a riparian corridor adjacent to Mill Creek with trees and shrubs to provide shade, cover and insect habitat for fish;

7. Planting trees and shrubs over 28.8 acres of the site to provide wildlife habitat and restore wetlands to the type characteristic of pre-development in the Auburn valley.

Declaration of Marc Boule ¶ 15 (docket no. 47). The Mitigation Plan incorporates a 15–year monitoring plan and requires NRA to provide financial security to guarantee adequate funding. *Id.* at ¶ 18. Finally, the Mitigation Plan provides that the mitigation site will be preserved in perpetuity through the establishment of an open space conservation easement. *Id.* at ¶ 19.

■ Considering the mitigation required by the § 404 permit at issue, the environment on the whole will not suffer irreparable injury. Although 17.4 acres of wetlands will be lost at the proposed site, NRA will create 56.5 acres of new or restored wetlands in the immediate vicinity. Under all the circumstances in this case, Plaintiff fails to show irreparable injury.

■ In addition, the Court finds that the balance of hardships tips in favor of denying a preliminary injunction. The Court notes that numerous uncontroverted declarations filed in conjunction with NRA's Response Brief indicate the harm to the thoroughbred horse racing industry that could result from a delay in, or halt to, the construction of the track at Auburn. *See* docket nos. 44, 46, and 49–51. The Court also notes that the Washington State Horse Racing Commission has previously concluded, as a matter of law, that

9. Plaintiff attached to its Reply Brief three letters from other agencies (United States Environmental Protection Agency, Washington State Department of Fish and Wildlife, and Washington State Department of Transportation) expressing concerns about the mitigation plan. The Court finds that these letters are based on those agencies' review of the Draft EIS and were written over six months before the Corps published the Final EIS. Therefore, the Court assigns little weight to the letters as they relate to the adequacy of the final mitigation plan.

"[l]ocating a track in … Lacey beyond the existing industry infrastructure is not in the best interests of legitimate racing." AR 835. Considering this statement from the agency solely charged with the authority to license horse race meets involving parimutuel wagering, RCW 67.16.010 & .050, the Court is of the opinion that the Lacey site does not constitute a meaningful alternative to the Auburn site, and that, if CAPOW or the Lacey proponents are ultimately successful in halting the development of the Auburn racetrack, the location and construction of a new thoroughbred racetrack in western Washington would be substantially delayed. Such delay could cause irreparable financial harm to the thoroughbred horse racing industry in Washington. Declaration of Marie Clifford ¶ 22 (docket no. 49); *see also* Declaration of Jack Hodge ¶¶ 4–14 (docket no. 44).

CAPOW has previously raised, during the administrative proceedings before the Corps, the substance of each of the arguments presented by these pending motions. The Corps carefully considered these same arguments and has provided a thorough and rational explanation for its actions in the administrative record. The administrative record before this Court "clearly demonstrates" that no "practicable alternative" with a "less adverse impact on the aquatic ecosystem" exists. The Court concludes that Plaintiff has almost no chance of success on the merits and presents minimal evidence of irreparable harm. The Court therefore DENIES Plaintiff's motions for a temporary restraining order and a preliminary injunction.

IT IS SO ORDERED.

The Clerk is directed to call counsel and to send copies of this Order to all counsel of record.