**SAVE THE YAAK COMMITTEE, Donn Vance, Plaintiffs–Appellants,**

v.

**J.R. BLOCK, Secretary of Agriculture; R. Max Peterson, Chief, Forest Service; Thomas Costin, Region I Forester, Defendants–Appellees.**

**No. 86–3808.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1987.

Decided March 1, 1988.

As Amended May 11, 1988.

---

Charles Sheroke, Couer d'Alene, Idaho, for plaintiffs-appellants.

John T. Stahr, Washington, D.C., for defendants-appellees.

Before WALLACE, FLETCHER and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

The Save the Yaak Committee and Donn Vance (appellants) are appealing a district court decision denying their motion for summary judgment and request for injunctive relief, and granting the defendants' (appellees) cross-motion for summary judgment.

## I

### FACTS AND PROCEEDINGS BELOW

The Yaak River Road (the Road), extends approximately seventy miles from U.S. Highway 2, west of Libby, Montana, to its junction with Montana Highway 37 and U.S. Highway 93 near Eureka, Montana. The Road winds through the Yaak and Eureka Range Districts of the Kootenai National Forest, located in Lincoln County, Montana.

The mountain pine beetle has infested the extensive lodgepole pine stands located in the Upper Yaak Valley and portions of the Eureka district. The Forest Service has accelerated the harvest of these trees to salvage as many as possible. Over the next 20 years, the Forest Service estimates harvesting 175 million board feet on the Yaak and 54 million board feet on the Eureka tributary to the Road.

In the late 1960's, the Forest Service began reconstructing the Yaak River Road in five separate sections. Although environmental assessments (EA's) were prepared for four of the five sections, construction on the Porcupine Sullivan Creek section of the road began in June of 1982 without preparation of an EA. In fact, the Porcupine Sullivan Creek EA was not submitted until some two years after the Forest Service decided to reconstruct the Road. No comprehensive environmental impact statement (EIS) has ever been prepared for the reconstruction of the entire

road. Additionally, a biological assessment (BA) was never completed prior to the construction of any one of the road's sections. However, in June of 1983, after most of the sections had been reconstructed, a biological assessment for the five sections was completed.

In August of 1983, the appellants filed an action in district court alleging violations of the Endangered Species Act and the National Environmental Policy Act, and requested declaratory and injunctive relief. On August 5, after a hearing, the district court denied the appellants' motion for a temporary restraining order. The appeal of that order was never perfected. The appellants later filed a motion for summary judgment, and the appellees filed a cross-motion for summary judgment. While these motions were under submission, this court rendered its decision in *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985). The appellants then renewed their application for injunctive relief. The district court held a hearing on July 18, 1985, and rendered its published decision granting the appellees' cross-motion for summary judgment on April 15, 1986. *Vance v. Block,* 635 F.Supp. 163 (D.Mont.1986). On April 21, the appellants timely appealed to this court. The appellants argue that the Forest Service has failed to comply with the procedural and substantive requirements of the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA).

## II

## THE NATIONAL ENVIRONMENTAL POLICY ACT

The appellants argue that the Forest Service failed to comply with the National Environmental Policy Act. First, they argue that the EA was inadequate because it failed to analyze the project's impact on the environment. Additionally, they contend that each group of timber sales contracts was related to the reconstruction of a section of the Yaak River Road, the harvesting of timber, and the construction of secondary roadways necessary for the harvesting, and that all of these actions produced a cumulative impact on the environment. Because all of these actions are related and also produced a cumulative impact on the environment, appellants argue

that they should have been analyzed in an EIS. The appellees refute the assertion that these actions are related, and therefore argue that a single EIS was not necessary.

### A. *Standard of Review*

■ NEPA is primarily a procedural statute. *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir. 1987). Therefore, agency action taken without observance of the procedure required by law will be set aside. *Id.*

■ In reviewing an agency decision not to prepare an EIS pursuant to NEPA, our inquiry is whether the "responsible agency has 'reasonably concluded' that the project will have no significant adverse environmental consequences." *San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980) (citation omitted). If substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable. *Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1178 (9th Cir. 1982). Additionally, an agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to "supply a convincing statement of reasons why potential effects are insignificant." *The Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir.1985). Indeed, "the statement of reasons is crucial" to determining whether the agency took a "hard look" at the potential environmental impact of a project. *Id.; Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). Thus, we will defer to an agency's decision only when it is "fully informed and well-considered." *Jones v. Gordon,* 792 F.2d 821, 828 (9th Cir.1986).

### B. *The EA's Analysis of Environmental Impacts*

■ The Porcupine–Sullivan and the Yaak 92 Road Project EAs do not demonstrate that the Forest Service took a "hard look" at the environmental consequences of its actions. The frank and undisputed testimony of Forest Service personnel indicates that the Porcupine–Sullivan EA was not prepared to examine the environmental impacts, but to "evaluate various techniques of maintaining the road." Forest

Service Supervisor Morden stated that the EA "[h]ad nothing to do with the question of environmental impact of the road itself, because it [already] existed." Moreover, the Forest Service wildlife biologist stated that the EA was "inadequate with regard to wildlife." The EA's entire discussion of wildlife is comprised of five brief sentences.[1] The only sentence that deals with endangered species states: The pass between Porcupine and Sullivan is in Grizzly Bear Situation IV." The discussion of the project's effects on wildlife merely states: "[a]ll alternatives will temporarily displace wildlife particularly big game during construction activities."

The Council on Environmental Quality (CEQ) regulations state that an environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (1987). Moreover, the EA "[s]hall include brief discussions of ... the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) (1987). Since this EA was not intended to evaluate environmental consequences, it did not meet these threshold requirements.

■ The appellees contend that even if the EA was inadequate, it was supplemented by the biological assessment (BA) and thus could reasonably support the Finding of No Significant Impact (FONSI).

Although the Endangered Species Act allows a biological assessment to "be undertaken as part of a Federal agency's compliance with the requirements of ... the National Environmental Policy Act of 1969 (42 U.S.C. 4332)," 16 U.S.C. § 1536(c)(1), this subsection does not indicate that a BA may substitute entirely for an EA. While a BA analyzes the impact of a proposed action upon endangered species, an EA analyzes the impact of the proposed action on all facets of the environment. Thus, if only a BA is prepared there may be gaps in the agency's environmental analysis.

In this case, even considering the EA and the BA together, the environmental analysis still has gaps. Various aspects of the environment were not evaluated in either of these documents. For example, although the BA considered the effects on endangered and threatened species, the EA did not seriously review the impacts of the project on other wildlife. Nor did the EA discuss the project's impact on plant life or recreation. Therefore, we conclude that substantial questions were raised regarding whether the project may have a significant effect on the quality of the environment.

Moreover, the preparation of these environmental documents was untimely. Proper timing is one of NEPA's central themes. An assessment must be "prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5 (1987). The CEQ regulations "require federal agencies to 'integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values....'" *Andrus v. Sierra Club*, 442 U.S. 347, 351, 99 S.Ct. 2335, 2338, 60 L.Ed.2d 943 (1979) (citations omitted); *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982). "The rationale behind this rule is that inflexibility may occur if delay in preparing an EIS is allowed: 'After major investment of both time and money, it is likely that more environmental harm will be tolerated.'" *Confederated Tribes and Bands of the Yakima Indian Nation v. FERC*, 746 F.2d 466, 471–72 (9th Cir.1984) (quoting *Environmental Defense Fund v. Andrus*, 596 F.2d 848, 853 (9th Cir.1979)), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985).

In this case, the reconstruction contracts were awarded prior to preparation of the EAs, and by the time the BA was prepared, construction had already begun. These events demonstrate that the agency did not comply with NEPA's requirements concerning the timing of their environmental analysis, thereby seriously impeding the

---

**1.** These five sentences read:

The big game species most common to the area are mule deer, whitetail, moose, black bear, elk and mountain lion. Porcupine is best classified as summer/fall range for elk, deer, and moose, year-round for black bear and mountain lion. The pass between Porcupine and Sullivan is in Grizzly Bear Situation IV. From the pass to Burro Creek is year-long range for all species, particularly elk. Down one-half mile from Burro Creek is winter range for deer and elk.

degree to which their planning and decisions could reflect environmental values.

Therefore, in light of the EAs' and BA's substantive inadequacies and their untimely preparation, we conclude that the agency did not take the required "hard look" at the environmental consequences of its actions. There are material issues of fact concerning the effect the proposed reconstruction may have upon the quality of the human environment. Therefore, summary judgment was improper.

## C. *The EA's Analysis of Connected Actions*

█ The CEQ regulations require "connected actions" "to be considered together in a single EIS." *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985). These regulations define "connected actions" as actions that are "closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1) (1987). "Connected actions" ...:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger actions for their justification.

*Id.* At issue then, is whether the road reconstruction and the timber sales are "connected actions" within the meaning of section 1508.25(a)(1). Central to this inquiry is our analysis in *Thomas v. Peterson.*

In *Thomas,* we concluded that logging operations and the construction of a road were "connected actions." In coming to this conclusion, we considered six factors.[2] After reviewing these factors, we stated that "[i]t is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales." *Id.* at 758. This case is strikingly similar to *Thomas,* and we review the same factors we considered in that case.

### 1. *Characterization of the Road.*

Although the Forest Service did not explicitly characterize this road as a logging road, in its EA the Forest Service stated that the reason for improving the Road was "because of the needs generated by this increased logging activity, associated timber hauling and user safety."

### 2. *The Statement in the Environmental Assessment.*

The Porcupine–Sullivan EA unequivocally stated that the "[t]he primary objective of this project is to upgrade the existing Porcupine–Sullivan system to a double lane paved standard to accommodate increased traffic associated with accelerated harvest of high-risk lodgepole pine." The uncontroverted testimony of Forest Service personnel confirmed that this was the purpose.

### 3. *Rejection of the "no action alternative."*

As United States Forest Service supervisor William Morden stated: "the road as it existed couldn't support the log haul." "The existing base is inadequate and would not provide minimum structure to accommodate the projected traffic." The Environmental Assessment stated that the "no action" alternative was being rejected because "[t]he existing base is inadequate and would not provide minimum structure to accommodate projected traffic." The projected increase in traffic was "associated with accelerated harvest of high risk lodgepole pine." Ranger Morden also testified that alternative five (double-lane paved) was chosen because that alternative did the "best job of minimizing construction, haul and maintenance costs over the 20 year period[,] [provides] for safety un-

**2.** These factors were: (1) the Forest Service characterized the road as a logging road, (2) the environmental assessment stated that the reason the road was built was to "access the timber lands to be developed over the next twenty years," (3) the "no action" alternative was rejected because "that alternative would not provide the needed timber access," (4) "the cost-benefit analysis of the road considered the timber to be the benefit of the road," (5) the Forest Service did not claim that other "benefits would justify the road in the absence of the timber sales," (6) a letter was written to the Forest Supervisor from the Regional Forester that stated: "We understand that sales in the immediate future will be dependent on the early completion of portions of the Jersey Jack Road. It would be advisable to divide the road into segments and establish separate completion dates for those portions to be used for those sales." 753 F.2d at 758–59.

der increased traffic conditions and maintains or increases the current operating season." [3] The "no action" alternative was rejected because it could not meet these goals.

### 4. The cost-benefit analysis.

The EA for the Yaak 92 Road Project measured all the benefits of the reconstruction in millions of board feet. All maintenance costs were analyzed using thousands of board feet.[4] The cost-benefit analysis and the economic "analysis of the road considered the timber to be the benefit of the road." *Thomas v. Peterson*, 753 F.2d at 758. No recreational or other benefits were analyzed.

### 5. Other benefits claimed.

Although the Forest Service argues that the road will yield other benefits (e.g. recreational users), it has not demonstrated that these other "benefits would justify the road in the absence of the timber sales." *Id.* at 758–59.

### 6. Segmenting Road Reconstruction.

As in *Thomas*, here the Forest Service awarded timber contracts, segmented the road reconstruction, set completion dates for each segment, and tied the completion of the reconstruction to the timber sales. Ranger Morden explained that each segment of the road was to be reconstructed pursuant to a particular timber contract:

Segment C indicates that the first seven miles have no work under contract. The next 15 miles have reconstruction of the base under Mud Creek and Basin Creek timber sales. Segment D is a plan to be reconstructed through a double-lane paved base under the Solo Joe timber sale. Segment E was to be built to a double-lane standard under the Donkey Divide timber sale.

We conclude there is a clear nexus between the timber contracts and the improvement of the road. Virtually all of the testimony established that the purpose of

the road was to make the log hauling more efficient, productive, and safe. There is no indication that the road was reconstructed for any other reason. "[T]he road would not be [reconstructed] but for the contemplated timber sales." *Id.* at 758.

 *Thomas* teaches that an environmental assessment must include an analysis of these connected actions. This assessment of connected actions is necessary even if the impact of the proposed action is not significant. The impact or significance of a particular project is a separate analysis to be considered in deciding whether to prepare an EIS or only an EA.

 In *Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir.1974), we stated that an EIS must cover subsequent phases of development when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." *Id.* at 1285, *quoted in Thomas*, 753 F.2d at 759. "The dependency of the road on the timber sales meets this standard; it would be irrational to [reconstruct] the road and then not sell the timber to which the road was built to provide access." *Thomas v. Peterson*, 753 F.2d at 759.

The road reconstruction, timber harvest, and feeder roads are all "connected actions" that must be analyzed by the Forest Service in deciding whether to prepare an EIS or only an EA. Thus, these "connected actions" raise material issues of fact concerning the effects that these actions may have on the human environment. Summary judgment was not appropriate.

### D. The EA's Analysis of Cumulative Impacts

 The appellant also contends that the cumulative impacts of the reconstruction, the timber sales, and the construction of secondary roadways, necessitates the preparation of an environmental impact statement. The district court dismissed this argument, stating that "the two events are [not] 'cumulative actions,'

---

3. The record reveals that the 20 year period had reference to a twenty year log haul. The record also reveals that the term "haul" means "hauling the timber over the road," and the term "current operating season" refers to the logging season.

4. Similar to the cost-benefit analysis in the Environmental Assessment of Yaak 92 Road Project

is the "economic analysis" found in the appendix to the EA for the Porcupine–Sullivan portion of the Yaak River Road. That EA also considered only assumptions "geared toward the harvesting of timber," and did not address the economic effect on recreational users, or any other alleged purpose for construction.

which, when viewed together, have cumulatively significant impacts." *Vance v. Block*, 635 F.Supp. at 168.

"Cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2) (1987). A cumulative impact is defined as:

> the impact on the environment which results from the incremental impact of the actions when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (1987).

Both connected actions and unrelated, but reasonably foreseeable, future actions may result in cumulative impacts. As discussed, there is an inextricable nexus between the road reconstruction and the logging operations. Yet, the EA did not evaluate the environmental impacts of either the reconstruction or the ongoing and future accelerated timber harvest. The cumulative impact of these actions raises material issues of fact concerning the project's effect upon the human environment. Thus, summary judgment was improper.

## III

### THE ENDANGERED SPECIES ACT

■ The appellants argue that the Forest Service failed to comply with the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, because it did not prepare a biological assessment before it decided to proceed with the project, award a contract, and allow actual reconstruction to begin.

The appellees concede that the environmental assessment was untimely, but counter that: (1) the later BA cured the deficiency, (2) the appellants are barred by laches from contesting the adequacy of the EA, and (3) a failure to prepare the BA did not foreclose other reasonable alternatives. The district court held that the ESA cause of action was barred by laches.

The ESA, 16 U.S.C. § 1540(g)(1), provides for "citizens suits" to enforce the provisions of the Act. However, section 1540(g)(2)(A)(i) states that "[n]o action may be commenced under sub-paragraph (1)(A) of this section prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." "Secretary" is defined to mean the Secretary of the Interior or the Secretary of Commerce. 16 U.S.C. § 1532(15).

This court recently held that a similar 60 day notice requirement in the Resources Conservation and Recovery Act of 1976, 42 U.S.C. § 6972(b)(1) was jurisdictional, not procedural. *Hallstrom v. Tillamook County*, 831 F.2d 889 (9th Cir.1987). Because the *Hallstrom* appellants failed to give written notice of the alleged violation to the Secretary before the 60 day period, *Hallstrom* held that the court lacked federal subject matter jurisdiction to reach the merits of the appellants' claim. *Id.* at 891.

In this case, appellants rely on two letters, one written to Bill Morden, Supervisor of the Kootenai National Forest, Libby, Montana, and the other to Robert H. Shields, Regional Director, U.S. Fish and Wildlife Service, U.S. Dept. of Interior at the Denver Federal Center, Denver, Colorado, with carbon copies to various state and federal legislators and environmental groups, to satisfy the ESA's written notice requirement. However, neither letter specifically gives notice of a violation or notice of an intention to sue. Even if these letters provided the requisite notice of a violation, the letters were not sent to the correct person, the secretary, as required. An actual notice of intention to sue was sent to the appellees by the appellants only 38 days before the appellants filed their complaint, and therefore cannot satisfy § 1540(g)(2)(A)(i)'s 60-day written notice requirement.

While this case involves a different environmental statute from the one at issue in *Hallstrom*, both statutes have very similar 60 day notice requirements. The only difference is that the ESA requires "written notice," whereas the Resource Conservation Recovery Act requires only "notice". Additionally, "courts have construed these [notice] provisions identically despite slight differences in wording." *Hallstrom*, 831 F.2d at 890.

Because of the failure to give written notice timely, we lack jurisdiction to reach the ESA claim. Therefore, we dismiss the appeal with regard only to the ESA issue.

## IV

### INJUNCTION

"The basis for injunctive relief is irreparable injury and inadequacy of legal remedies." *Amoco Production Co. v. Village of Gambell,* — U.S. —, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of granting or withholding of the requested relief." *Id.* Additionally, a Congressional grant of jurisdiction to insure compliance with a statute will not ordinarily limit the court's discretion to issue or deny injunctions unless the statute "in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity." *Id.* at 1403. There is nothing in NEPA to indicate that Congress intended to limit this court's equitable jurisdiction. *Northern Cheyenne Tribe v. Hodel,* 842 F.2d 224 (9th Cir.1988). Therefore, we must follow the above well-established principles governing an award of injunctive relief.

Although the Supreme Court has rejected a *Presumption* of irreparable injury when an agency fails to thoroughly evaluate the environmental impact of a proposed action, the Court has noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Production Co. v. Village of Gambell, Id.,* at —, 107 S.Ct. at 1404. Therefore, when environmental injury is "sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*

We conclude that the risk of environmental injury is sufficiently likely to authorize enjoining further reconstruction and timber sales. Scientific evidence indicates that the reconstruction activities and related timber sales would have a severe impact on the Cabinet-Yaak Grizzly Bear populations. There is also evidence of the project's adverse effect on the caribou habitat. On the other side of the balance, this court has not been apprised of any counterveiling equities that would suggest that an injunction is inappropriate, or even counterproductive. *American Motorcyclist Association v. Watt,* 714 F.2d 962, 966 (9th Cir.1983), citing *Alpine Lakes Protective Society v. Schlapfer,* 518 F.2d 1089, 1090 (9th Cir. 1975). Nor is the court presently aware of any irreparable injury to third parties that would be caused by entry of an injunction against further reconstruction activities and timber sales. Cf. *Amoco Production Co. v. Village of Gambell, Id.* at —, 107 S.Ct. at 1404. Accordingly, we enjoin the defendants from conducting further reconstruction and timber sales until the district court resolves these issues consistent with this opinion.

## V

### CONCLUSION

The Forest Service failed to comply with the requirements of the National Environmental Policy Act. The EA was clearly deficient, and the filing of the untimely BA could not cure the deficiency in the EA. Moreover, the Forest Service was required to consider connected and cumulative actions, but failed to do so.

In light of the substantive and procedural violations of NEPA, we reverse the district court's summary judgment in favor of the Forest Service, enjoin further reconstruction and timber sales and remand the NEPA issue for further proceedings consistent with this opinion. Additionally, we dismiss the appeal on the ESA issue only.

REVERSED in part and DISMISSED in part.