NATURAL RESOURCES DEFENSE COUNCIL, et al., Plaintiffs,

v.

C. Dale DUVALL, as Commissioner of the Bureau of Reclamation, United States Department of the Interior, et al., Defendants.

Central Valley Project Water Association, et al., Intervenors.

No. Civ. S–88–375 LKK.

United States District Court, E.D. California.

July 26, 1991.

---

Hamilton Candee, San Francisco, Cal., for plaintiffs.

Kenneth A. Kuney, Tulare, Cal., Paul Scott Simmons, Stewart Leslie Somach, Sacramento, Cal., and Thomas Humphrey, for intervenors.

## ORDER

KARLTON, District Judge.

Before the court is the plaintiffs' motion for summary judgment.[1] Plaintiffs' suit attacks the adoption of regulations implementing the Reclamation Reform Act ("RRA") on the grounds that prior to adoption the Bureau of Reclamation was required to perform an Environmental Impact Study ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. For the reasons I explain below, the motion is granted.

---

[1] Also pending before the court is the motion of the intervenors seeking to strike material tendered to the court in support of the motion for summary judgment. Because the relevant evidence concerning the adoption of the regulations appears not to be in dispute, I believe that this disposition renders that motion moot. To the extent the motion is still vital, it is denied. Evidence tendered to demonstrate standing should not be stricken on the basis that it is de hors the administrative record, since such an objection is simply irrelevant. Material de hors the record tendered to demonstrate that the agency failed to adequately consider all factors is also admissible. *Asarco, Inc. v. U.S. E.P.A.,* 616 F.2d 1153, 1160 (9th Cir.1980); *Love v. Thomas,* 858 F.2d 1347, 1356, (9th Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989).

# I

## THE RECLAMATION ACTS

In 1902, Congress adopted the first Reclamation Act. Its purpose was to "encourage family farming on modest sized parcels and to increase agricultural output by subsidizing the irrigation of formerly arid and unproductive lands." *Barcellos & Wolfson, Inc. v. Westlands Water Dist.,* 899 F.2d 814, 824 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990). The Act was designed to limit private speculative gains resulting from the existence of reclamation projects, *see United States v. Tulare Lake Canal Co.,* 535 F.2d 1093, 1119 (9th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977), which ultimately provided irrigation water to farmers throughout the 17 western states at prices substantially below cost. To ensure family-sized farming and prevent private speculation, the original Act limited the delivery of water to farms no greater than 160 acres in size [2] actually occupied by the farmer.[3]

Congress' intent to limit the benefits of the Reclamation Act to small family farms was frustrated by the executive branch. "As the program has been administered by the Department of the Interior ... the vast federal subsidy has been flowing to many farming operations which in no way resemble the small, family-owned farms envisioned by the enacting Congress." *Peterson v. U.S. Dept. of the Interior,* 899 F.2d 799, 804 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). Instead, through leasing arrangements and other devices, the water districts and large farming interests, with the acquiescence of the Department, "found ways to circumvent the 160–acre limitation," *id.,* resulting in the enormous federal subsidies involved in supplying reclamation water being provided to very large farming operations. *Id.* at 805.

In 1982, Congress again addressed the question of the appropriate recipients of federal water subsidies. "With the RRA, Congress redefined completely who could receive subsidized reclamation water and the price they would pay." *Id.* at 806. The 160–acre limitation "was discarded as incompatible with modern farming techniques. In its place, Congress authorized the sale of project water at the new, though still subsidized, rates to 'qualified recipients' for land holdings up to 960 acres and to 'limited recipients' for land holdings up to 320 acres." *Id.; and see* 43 U.S.C. § 390ee(a).

The RRA is divided into discretionary and mandatory provisions.[4] The discretionary provisions concern the increased acreage limitations, § 390dd, the equivalency provisions, § 390gg, the operation and maintenance charge provisions, § 390hh, and provisions pertaining to certification of compliance, § 390ff. The Act contains a "hammer clause," 43 U.S.C. § 390cc, which provides that any water district that does not conform its contracts to comport with the discretionary provisions of the RRA by April 12, 1987, must pay full costs for water delivered to land holdings in excess of 160 acres. Thus, "[a]lthough the Act does not bar the Department of Interior from providing water altogether. to qualified recipients for use on leased lands that exceed the 960–acre limitation, the recipients are required to pay the 'full cost' for any such water." *Peterson,* 899 F.2d at 806.

# II

## THE REGULATIONS AND NEPA

A. *The Adoption of the Regulations*

The RRA provides that "[t]he Secretary may prescribe regulations and shall collect all data necessary to carry out the provi-

---

**2.** "No right to the use of water for land in private ownership shall be sold for a tract exceeding 160 acres to any one land owner." 43 U.S.C. § 431.

**3.** Delivery was restricted to "an actual bona fide resident on such land, or occupant thereof re-

siding in the neighborhood of said land." 43 U.S.C. § 431.

**4.** The provisions of the RRA to which all receivers of federal water are subject are contained in sections 390ii–zz.

sions of [the] ... Federal reclamation law." 43 U.S.C. § 390ww(c). On two occasions, the Bureau of Reclamation has promulgated regulations to implement the RRA. The first set of regulations were issued on December 6, 1983. An Environmental Assessment ("EA") with a finding of no significant impact ("FONSI") was issued for this set of regulations in 1983. The second set of regulations was issued on April 13, 1987, the date the hammer clause went into effect. A second EA, which again resulted in a FONSI, issued in 1987. In 1988, the 1987 rules were revised[5] and the 1987 EA and FONSI were supplemented.[6] It is the second and third set of regulations which are challenged in this lawsuit.[7]

The 1987 regulations, covering a wide variety of matters, were issued in compliance with the notice and comment requirements of 5 U.S.C. § 553. Among other things, the regulations set the price of water and, where the Secretary is given discretion, the amount for recovery of capital costs; define the term "lease;" determine whether trusts are subject to the acreage limitation provisions; determine whether non-resident aliens can indirectly receive subsidized water; and prescribe the procedures by which water users will comply with both the certification, reporting and water conservation provisions of the RRA.

Plaintiffs assert that the FONSI relating to the adoption of the rules implementing the RRA was unjustified and that the Bureau was required to do an Environmental Impact Statement ("EIS") under the NEPA, 42 U.S.C. §§ 4321 et seq.

NEPA requires that all agencies of the federal government prepare an EIS for inclusion "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). Under the pertinent administrative regulations, "major Federal action" includes "new or revised agency rules, regulations, plans, policies or procedures." 40 C.F.R. § 1508.18(a). The Bureau conceded in the 1987 FONSI that the challenged rules are "a major federal action pursuant to CEQ [Council of Environmental Quality] regulations," FONSI at 2[8], and no party contests that finding. Accordingly, adoption of these regulations requires preparation of an EIS if their adoption may significantly affect the quality of the human environment.

### B. Standard of Review

■ Because NEPA is essentially a procedural statute, *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), review of agency action is governed by section 706(2)(D) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D). Accordingly, the agency action at bar may be set aside if undertaken "without observance of procedure required by law." *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.1988); *see also People ex rel. Van De Kamp v. Marsh*, 687 F.Supp. 495, 498 (N.D.Cal.1988).[9] The Ninth Circuit has

---

5. The Bureau on December 16, 1988, issued a limited number of supplemental rules to implement the 1987 amendments to the RRA. 53 Fed.Reg. 50,530 (as codified in 43 C.F.R. §§ 426 et seq.) (1988).

6. Because the supplemental EA and FONSI are based on the 1987 EA, their validity depends on the 1987 EA.

7. Intervenors contend that plaintiffs are barred by laches in bringing this challenge. This action was filed within eleven months after promulgation of the regulations at issue. Plaintiffs' response to the laches charge demonstrates that intervenors' argument borders on the frivolous.

8. The FONSI notes several changes from the 1983 rules that have impact on landowners or lessees. They include criteria to distinguish be-

tween lessees and custom farmers, trust land attribution, non-resident alien eligibility through legal entities, water transfer criteria, deed covenant applications with respect to involuntary acquisitions, leasing of lands by religious and charitable organizations, calculations of non-full cost entitlement, commingling criteria, the appropriate rate for water delivery to lands under extended recordable contracts, and certification and reporting requirements. 1987 EA at 6–7.

9. The statute provides in part: "The reviewing court shall (2) hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; ... (D) without observance of procedure required by law...." 5 U.S.C. § 706.

held that in determining whether or not an EIS must be prepared, the applicable standard is one of "reasonableness." *Foundation for North Am. Wild Sheep v. United States,* 681 F.2d 1172, 1177 n. 24 (9th Cir. 1982).

Intervenors and defendants, relying upon *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), argue that the arbitrary and capricious standard applies. Defendants claim that the present litigation primarily involves issues of fact, and that under *Marsh,* the court applies the arbitrary and capricious standard of review to resolve any dispute under NEPA involving such issues. While they acknowledge that *Marsh* dealt with the standard of review relative to a decision not to supplement an EIS, they argue that there is no reason to apply a different standard of review in the instant case. I cannot agree.

I begin by noting that the Ninth Circuit has had an opportunity to consider the *Marsh* decision and has not indicated any intent to give *Marsh* the expansive reading intervenors suggest. *Oregon Natural Resources Council v. Lyng,* 882 F.2d 1417, 1422 n. 3 (9th Cir.1989). Moreover, *Marsh* simply cannot be read to imply that all environmental review should be governed by an arbitrary and capricious standard. Indeed, the *Marsh* Court limited its holding to the "narrow question" of what standard governs review of a decision not to supplement an EIS. *Marsh,* 490 U.S. at 376, 109 S.Ct. at 1860. Finally, as a matter of proper statutory implementation, *Marsh* ought not be read to compel a single standard. Various questions under NEPA implicate different statutory concerns and the standard appropriate for resolution of one issue is not necessarily appropriate for the other. Given the different statutory concerns, a distinction should exist between review of the adequacy of an EIS and review of a FONSI determination. In the first case, a full blown environmental review has occurred, and the question is its adequacy; in the later, no further environmental assessment will be undertaken. An inappropriate FONSI frustrates, at the initiation of the deliberative process, the statutory purpose of insuring that the agency take a "hard look" at the environmental consequences of its action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

The Circuit has observed "the spirit of [NEPA] would die aborning if the facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review." *Foundation for North Am. Wild Sheep,* 681 F.2d at 1182–83, *citing Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466 (5th Cir.1973). Consistent with this view, the Circuit has established a relatively low threshold for preparation of an EIS. In *Save the Yaak Committee,* 840 F.2d at 717, the court explained that in reviewing an agency's decision not to prepare an EIS pursuant to NEPA, the inquiry is whether the responsible agency has reasonably concluded that the project will have no significant adverse environmental consequences. *Id., citing San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980). "[I]f substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Committee,* 840 F.2d at 717, *quoting Foundation for North Am. Wild Sheep,* 681 F.2d at 1178. An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to "supply a convincing statement of reasons why the potential effects are insignificant." *Save the Yaak Committee,* 840 F.2d at 717, *quoting The Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir.1985). As the court explained, "the statement of reasons is crucial" to determining wheth the agency took a "hard look" at the potential environmental impact of a project. *Save the Yaak Committee,* 840 F.2d at 717, *quoting Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). Finally, the Ninth Circuit held that "we will defer to an agency's decision only when it is 'fully informed and well considered.' " *Save the Yaak Committee,* 840

F.2d at 717, *quoting Jones v. Gordon,* 792 F.2d 821, 828 (9th Cir.1986).

## III

## THE 1987 EA

### A. *Incorporation of the 1981 DEIS and 1983 EA*

■ Before turning to plaintiffs' attack on the EA, I must establish what materials may be examined in its support. In that regard, it is fundamental that the environmental document at issue and the material incorporated therein are the sole permissible source of justification for an agency's conclusions. *See generally, LaFlamme v. FERC,* 852 F.2d 389, 399 (9th Cir.1988); *see also Foundation for North Am. Wild Sheep,* 681 F.2d 1172. As I have previously observed, "[w]hile those attacking the administrative determination explained in the EIS are by necessity not ordinarily bound by the administrative record," *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 612 (9th Cir. 1981) (Karlton, J., dissenting), *citing generally, Asarco,* 616 F.2d at 1153, generally justification for the agency's decision "is limited to the four corners of the environmental statement itself, since it is the administrative record for purposes of review." *California v. Bergland,* 483 F.Supp. 465, 488 (E.D.Cal.1980), *aff'd in part, rev'd in part, California v. Block,* 690 F.2d 753 (9th Cir.1982).

■ Defendants assert that both the 1981 DEIS and the 1983 EA were incorporated by reference into the 1987 Environmental Assessment.[10] It is true that the EA contains some reference to a study conducted in connection with the 1981 regulations.[11] The question is whether an EA may incorporate by reference and, if so, under what standards.[12]

I begin by noting that there is no apparent reason to believe that an incorporation process is appropriate relative to an EA. Thus although the CEQ regulations permit, under stringent standards discussed below, incorporation by reference in an EIS, 40 C.F.R. § 1502.21, no such provision is made for an EA. On the contrary, the regulations appear to contemplate that an EA will be a concise public document which briefly presents sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI. 40 C.F.R. § 1508.9. Given the purpose of an EA, such restriction on the document does not appear unreasonable. As I explained above, the threshold for requiring an EIS is quite low. Thus only in those obvious circumstances where no effect on the environment is possible, will an EA be sufficient for the environmental review required under NEPA. Under such circumstances, the conclusion reached must be close to self-evident and would not require an extended document incorporating other studies. Moreover, because the purpose of an EA is to decide whether an EIS must be prepared, 40 C.F.R. § 1501.4(a), (b), (c); *Jones v. Gor-*

10. Although the 1981 DEIS and the 1983 EA have each been made a part of the administrative record in this case, it does not follow that they are part of, or incorporated into the 1987 EA. *LaFlamme v. FERC,* 852 F.2d 389, 399 (9th Cir.1988).

11. The relevant language of the EA reads: "The Westlands case study, appendix F, of the 1981 draft environmental impact statement for acreage limitation, examined these and other potential sources of impact to the natural environment related to the implementation of acreage limitation provisions on the WWD. The study of the natural environment on Westlands concluded that the impacts resulting from acreage limitations were of a very minor nature. Our reexamination of the 1981 Westlands studies indicates that its conclusions concerning the

natural environment are generally applicable to the current proposed rules on WWD will be insignificant. Because the WWD would be one of the areas most highly impacted by this rulemaking, it follows that the impacts to the natural environment resulting from the rulemaking in other areas should be even less significant." 1987 EA at 32.

12. The 1987 FONSI is a two-page document to which the 1987 EA is attached. Pursuant to CFR regulations, the Bureau properly incorporated the environmental assessment. *See* 40 C.F.R. § 1508.13. I note that the regulations provide only for incorporation of an EA in a FONSI. Because the FONSI depends on the EA for its analysis of no environmental impact, its justification must be found in the 1987 EA.

*don,* 792 F.2d 821, 827 (9th Cir.1986), the document itself (and any attachments or appendices included with it) must facilitate or enable public comment concerning the agency's determination that the project does not significantly affect the environment. *Cf. Sierra Club v. U.S. Forest Service,* 843 F.2d 1190, 1193 (9th Cir.1988).

Moreover, even if an EA need not stand on its own, the standards applicable to the incorporation of material into a document created in response to the regulations implementing NEPA are relatively rigid. Application of those standards to the instant EA demonstrates that neither the 1981 DEIS nor the 1983 EA were properly made a part of the determination at bar.

■ As I have previously explained, under certain circumstances the law permits incorporation of materials by reference into an EIS.[13] The propriety of such incorporation is dependent upon meeting three standards: 1) the material is reasonably available; 2) the statement is understandable without undue cross reference; and 3) the incorporation by reference meets a general standard of reasonableness. *See California v. Bergland,* 483 F.Supp. at 485 (incorporation of material into a DEIS), *aff'd in relevant part, California v. Block,* 690 F.2d at 765. Application of the three criteria noted above suggests that the court must find that the 1981 DEIS and the 1983 EA were not incorporated into the 1987 EA.[14]

I begin by noting that there is an absence of record evidence concerning public availability of the assertedly incorporated material. Second, while the EA's conclusion is understandable without reference to the incorporated material, to the extent the 1987 EA is dependent for its justification on the findings in the DEIS and the 1983

EA, undue cross-reference is required because the previous findings are referred to in the 1987 document in only the briefest and most cursory manner. Finally, incorporation fails the test of general reasonableness. While the 1987 EA adverts to the Westlands study conducted in conjunction with the 1981 EA, it neither details the study nor even explicitly asserts incorporation. Finally, the 1987 EA is completely silent as to the 1983 EA. I conclude that the 1981 DEIS and 1983 EA have not been incorporated into the 1987 EA. Accordingly, the only justification for the conclusion that the regulation would have no significant impact is to be found within the language of the 33 pages of the 1987 EA and any material properly incorporated therein. I find that document utterly fails the most deferential test of reasonableness. Below, I sketch some of the EA's more serious deficiencies.

B. *Rational Utility Maximizer*

■ Underlying the Finding of No Significant Impact is the Bureau's assumption that the farmers subject to the Reclamation Reform Act will act as "rational utility maximizers." By this the FONSI means "individuals and legal entities affected by changes in acreage limitation will always act in their own best economic interest." EA at 16. By virtue of this assumption, the FONSI concludes that farmers will not want to pay full cost if they can legally avoid doing so and thus will become subject to the hammer clause so as to obtain the higher acreage limitation. It also concludes that where farmers are unable to obtain subsidized water they will switch to groundwater, but any increase in groundwater use by those subject to full cost will be offset by a decrease in groundwater use

---

**13.** While the discussion of incorporation by reference in the text is premised on the regulations governing an EIS, they appear to this court to be applicable by analogy to incorporation into an EA, assuming that such incorporation is permissible at all. *See* 40 C.F.R. § 1508.9 (no discussion of incorporation by reference). Although intended to be brief and to demonstrate a relatively self-evident proposition, the EA has the same purpose as an EIS, namely demonstrating the environmental consequences of a particular governmental action.

**14.** The issue of whether material was incorporated involves questions of both law and fact. Since the proponent of an issue ordinarily bears the burden of persuasion, *Federal Deposit Ins. Corp. v. Main Hurdman,* 655 F.Supp. 259, 262 (E.D.Cal.1987), it would appear that the government bears the burden of persuasion on the issue.

by those farmers who "took over" the surface supply declined by others. It is this court's view that the notion of a "rational utility maximizer" is an economic construct having no counterpart in the real world and is thus an inappropriate basis for the determinations which were made.

Ordinarily, the questions posed by a NEPA inquiry ask various scientific disciplines to consider what effect a given course of conduct will have on specific aspects of the environment.[15] In the EA at issue, however, the Bureau thought it necessary to predict the reaction of those affected by the hammer clause as a condition precedent to an assessment of the environmental consequences of the agency's action in adopting the regulations. The government chose to address this question by treating it as a theoretical economic issue, ignoring actual agricultural and economic conditions, much less historical, psychological, sociological and family considerations which might bear on individual farmers' reactions. This hardly inevitable Marxist-like exclusive focus on economic theory, itself a violation of the regulations, see footnote 15, is unexplained. What is inevitable, however, is that reliance on an economic construct will lead to false conclusions about the real world.

Even if it is conceded that it is not unreasonable to believe that those affected by the hammer clause will frequently act in what they believe to be their own best economic interests, rather than from other motives, such an assumption has little predictive value. To be able to predict conduct from such an assumption requires reliance on a series of other assumptions, none of which can be adopted with confidence. Thus to draw predictive conclusions, it is necessary to believe that all farmers are in possession of all the relevant economic data, will be able to evaluate the data correctly, and that the best interest can be determined at an abstract level without consideration of the particular circumstances of each farmer. The fact that particular economic circumstances will bear on

any given farmer's decision and that in any event evaluations of the best economic interest differ, should hardly surprise anyone. In sum, even assuming that the government's scenario were the most likely, a matter itself far from self-evident, it simply cannot bear the weight accorded it. A conclusion that the consequences of adoption of the regulations are uncertain points to the need for an EIS in order to study all the potential consequences of their adoption. Put another way, given that the government's premise is insupportable either as a matter of verifiable fact or as a matter of logic, the FONSI based on the premise is unreasonable. As I explain below, the FONSI suffers from a variety of other deficiencies.

C. *Ground Water and Surface Water Uses*

The plaintiffs attack the EA as failing to recognize the effect the regulations will have on both ground and surface water use. The EA recognizes that concerns were expressed regarding the effect acreage limitation rules would have on large farming operations. Nonetheless, the EA's analysis of the final rules suggests that the large farm operations would have options available to avoid adverse impact. The EA asserts that "despite the foregoing analysis, some large operations could conceivably choose to refuse federal project water in order to escape the full cost provisions of law; but, if they did, other operations in the same district would unquestionably make use of this project water, thereby reducing their own ground water usage." EA at 32. The EA concludes that the total amount of both types of water used would not be affected.

The reasonableness of the EA's conclusion is, to say the least, in doubt. The presumption that farming operations which had to switch to ground water would use the same amount as when they were able to use subsidized surface water is wholly unsupported and appears insupportable.

---

15. The regulations require that the agencies "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences ... in decisionmaking." 40 C.F.R. § 1501.2(a).

Indeed, if use of ground water costs no more than surface water, the entire subsidization process of the Reclamation Act would be unnecessary. More to the point, inasmuch as the EA has failed to analyze the various costs, its conclusion is not supported within the four corners of the EA. If, as appears likely, the cost of ground water is greater than the cost of surface water, farmers are as likely to switch to crops that use less water, or convert to dry land farming as switch to ground water. Moreover, the presumption of the EA that the change in ground water/surface water would be balanced seems equally dubious.

The EA presumes that a farmer wanting to convert to ground water use can do so with relative ease. That presumption flies in the face of the available evidence. Wells relatively short distances apart can yield dramatically different amounts of water. *See* Charles E. Corker, "Ground Water Law, Management and Administration," National Water Commission, at 47 (hereinafter "NWC"). If there are several wells in the same area rapidly drawing down the water table, interference between the wells can result and the pump will start sucking air. *Id.* at 47, *and see* p. 95. Although surface and ground water are often considered as separate systems, they are actually an integrated system because the surface water feeds the ground water and vice versa. Changes made in one part of the system inevitably effect other parts of the system. NWC at 53. Surface waters are sometimes imported for irrigation (i.e., not part of the natural flow of the streams) and may contribute through seepage and return flows a large quantity of non-native waters to the underground aquifer. NWC at 58. Depending upon the permeability of the soil, using less surface water in one area may change the amount by which the underground aquifer is recharged. Furthermore, overdrafted basins are becoming a serious problem in the West. *See, generally,* Anne J. Schneider, "Ground Water Rights in California," Governor's Commission to review California water rights law (1977). Overdrafted basins can seriously compound already existing well interference problems. If the overdraft becomes serious enough, ground water might become so expensive to pump that ground water would effectively become unavailable. None of these considerations are addressed in the 1987 EA.

Other problems associated with the use of ground water also are not addressed in the 1987 EA. Subsidence can be a major problem, causing damage to surface structures and irrigation works. NWC at 84. Ground water withdrawal in one area may not cause these problems, but when the farmers in an area switch, as suggested by the EA, these problems could appear because of a difference in soil composition in the new withdrawal area. Another problem not discussed in the EA is salt build-up. In areas of heavy ground water usage, salinity build-up is a great problem. *See* NWC at 88. Surface water must be used in conjunction with ground water, otherwise the soil will become toxic to plant life. *Id.*

Finally, given its narrow regional approach, the study which forms the basis of the EA's conclusion appears inadequate. The EA bases its conclusion in large part on the Westlands case study. This California case study, however, does not necessarily reflect the legal and practical conditions in other western states. California has a hodgepodge of ground water management districts under no central control. Many of the other western states, however, designate critical areas which may be closed to further appropriation, *see* Kan.Stat.Ann. §§ 82a–1020 to 82a–1035; Mont.Code Ann. § 85–2–506; Nev.Rev.Stat. §§ 534.010 to 534.340; N.M.Stat.Ann. § 72–12–20; Ore. Rev.Stat. § 537.730, or administer ground water under central state authority. *See* Colo.Rev.Stat. §§ 37–90–102 *et seq.,* Ariz. Rev.Stat. §§ 45–401 *et seq.* Thus presumptions about whether irrigators could easily switch to ground water in California are not necessarily applicable to other states.

In sum, I conclude that the central assumptions supporting the EA, leading to the central conclusion that application of the hammer clause will have no significant effect upon the use of water, appear unreasonable. Accordingly, an EIS is required.

### D. *Water Conservation*

Plaintiffs contend that the agency was required to consider an alternative that might provide greater environmental benefit through encouraging water conservation. Under the CEQ regulations, an EA must "include a brief discussion of alternatives as required by [NEPA]." 40 C.F.R. § 1508.9(b). Those regulations are entitled to "substantial deference," *California v. Block*, 690 F.2d 753, 763. Under plaintiffs' theory, the agency is required to determine the significance of beneficial environmental effects that might result from an alternative regulatory program. *See* 40 C.F.R. § 1508.27(b)(1) (a significant effect may exist even if on balance a federal agency believes the effect will be beneficial).

Under the statute, the Secretary is required to consider "prudent and responsible water conservation measures in the operation of non-federal recipients of irrigation water from federal reclamation projects, where such measures are shown to be economically feasible for such non-federal recipients." 43 U.S.C. § 390jj(a). The statute also requires that each district develop a water conservation plan.

While the EA examines the economic effects of the four alternatives considered, there is no discussion of the effect of water conservation. In light of the express statutory language, the absence of such an alternative appears to be inconsistent with the Secretary's duty.

### E. *Land Use and Cropping Patterns*

Underlying the EA analysis that there will be no environmental effect from the implementation of the hammer clause is the EA's expectation that no land will go out of production. EA at 32. By virtue of this conclusion, the 1987 EA contains no discussion of the environmental effects of the reorganization of large farms into smaller units or the retirement of marginal lands as a result of the full cost provisions of the RRA. Defendants and intervenors seek to support the conclusion of continued land use at the same level by pointing to evidence in the Administrative Record. As noted above, however, the FONSI must be justified by the EA and the materials incorporated therein. Moreover, given a report commissioned by the agency, the Moore report, it is hardly certain that no change in land pattern use will occur. Because there is reasonable doubt, analysis of alternatives is required.

## IV

### CONCLUSION AND ORDER

The court has concluded that summary judgment is appropriate on plaintiffs' NEPA cause of action. The question of the appropriate remedy pending completion of an EIS and promulgation of new regulations remains.[16] When raised at oral argument, all parties requested an opportunity for further briefing on this issue. The parties are therefore directed to address the following issues:

(1) What will be the effect of setting aside the current regulations pending completion of an EIS and promulgation of new regulations in compliance with the Bureau's NEPA obligations;

(2) Should the government maintain the operation of the current regulations in the interim;

(3) What plan is appropriate to ensure the Bureau's compliance with NEPA and promulgation of new regulations on a timely basis?

Plaintiffs shall file their proposed remedies and any points and authorities in support thereof within thirty (30) days of the

---

**16.** Plaintiffs seek declaratory relief as well as injunctive relief. Because of the court's disposition of the NEPA claim, the claim predicated on violation of the APA will not be addressed here. Although NEPA is essentially a procedural statute, *see Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. at 558, 98 S.Ct. at 1219; *Strycher's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980), and does not necessarily compel substantive results, at this juncture it is unclear what formulation the newly promulgated regulations will take after completion of an EIS. This court has no power to render advisory opinions, *see Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). Accordingly, I cannot decide claims based on a hypothetical set of regulations.

effective date of this order; defendants and intervenors are granted thirty (30) days thereafter to reply; and plaintiffs may file a closing memorandum fifteen (15) days thereafter. The court will set a hearing on the remedy if it believes such a hearing will be useful.

IT IS SO ORDERED.